WO                                                                                            JDN

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT**

**OF ARIZONA**

| | |
|---|---|
| Lee Michael Beitman, | No.  CV 17-08229-PCT-JAT (DMF) |
| Plaintiff, | |
| vs. | **ORDER** |
| Correct Care Solutions, et al., | |
| Defendants. | |

Plaintiff Lee Michael Beitman, who is confined in the Arizona State Prison Complex-Florence, South Unit, brought this pro se civil rights action under 42 U.S.C. § 1983 against Correct Care Solutions (CCS) and multiple individual medical personnel: Dr. Martin Gruenberg; Dr. D. Schmit; Nurse Practitioner (NP) Stephanie Herrick; NP Dorothy Igwe; NP Betty Hahn; and Nurse Amber Norton.  (Doc. 35.)[1]  Before the Court are Beitman's Motion for Injunctive Relief, Motion for Order, and Motion for Restraining Order with Injunctive Relief.  (Docs. 41, 44, 49.)[2]  The Court will deny Beitman's Motions.

---

[1] CCS is the private medical provider contracted to provide medical services at the Central Arizona Correctional Facility, a private prison in Florence, Arizona that is operated by the GEO Group.

[2] Also before the Court are Beitman's Motion for Order to Show Cause (Doc. 78), Motion for Default Judgment (Doc. 79), and Motions for Extension of Time for Service and for Discovery (Docs. 85–86).  These Motions will be addressed in separate orders.

1  **I.      Background**

2          In Count One of his Third Amended Complaint, Beitman alleged that in February

3  2016, while he was housed at the GEO private prison in Kingman Arizona, he was

4  assaulted by another prisoner and punched in the side of the face, which caused him to

5  suffer a displaced jaw, a pushed-in cheek bone, and severe pain.  (Doc. 35 at 4.)  Beitman

6  alleged that Dr. Schmit and NP Herrick failed to provide adequate treatment for his

7  injuries and were deliberately indifferent to his serious medical need, and Beitman further

8  alleged that CCS had customs, policies, and practices to ignore health needs requests; to

9  falsify medical records and keep incomplete records; and to deny specialist care, medical

10 procedures, and medications in part to save money.  (*Id.* at 7–8.)

11         In Count Two, Beitman alleged that for years he was denied proper medication

12 and proper medication dosages to treat his low testosterone levels despite lab tests and

13 prior medical records confirming his low testosterone levels.  (*Id.* at 9–11.)  Beitman

14 alleged that Nurse Norton, Dr. Gruenberg, and then NP Igwe and NP Hahn, all failed to

15 properly treat his hormone condition, and, consequently, Beitman's suffered secondary

16 problems including pain, cramping, and spine deterioration.  (*Id.* at 10–11.)

17         In October 2019, Beitman filed a Motion for Injunctive Relief, which alleges that

18 medical staff and Arizona Department of Corrections (ADC) staff have intimated that

19 because Beitman filed this lawsuit, he should not be housed in the Florence South Unit,

20 and Beitman seeks an order to prevent his transfer out of the South Unit.  (Doc. 41.)  On

21 November 13, 2019, after Defendants failed to respond to his injunction request, Beitman

22 filed his Motion for Order of Preliminary Injunction, asking the Court to grant his prior

23 Motion.  (Doc. 44.)

24         On December 4, 2019, Beitman filed a Motion for Restraining Order with

25 Injunctive Relief, which seeks specific medical treatment related to his low testosterone

26 condition.  (Doc. 49.)

27 **II.     Preliminary Injunction Standard**

28         "A preliminary injunction is 'an extraordinary and drastic remedy, one that should

not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary remedy never awarded as of right").   A plaintiff seeking a preliminary injunction must show that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest.  *Winter*, 555 U.S. at 20.  "But if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied."  *Shell Offshore, Inc. v. Greenpeace, Inc*., 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).  Under this "serious questions" version of the sliding-scale test, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another.  *See Alliance for the Wild Rockies*, 632 F.3d at 1135.

Regardless of which standard applies, the movant "has the burden of proof on each element of the test."  *See Envtl. Council of Sacramento v. Slater,* 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).  Further, there is a heightened burden where a plaintiff seeks a mandatory preliminary injunction, which should not be granted "unless the facts and law clearly favor the plaintiff."  *Comm. of Cent. Am. Refugees v. I.N.S.*, 795 F.2d 1434, 1441 (9th Cir. 1986) (citation omitted).

The Prison Litigation Reform Act imposes additional requirements on prisoner litigants who seek preliminary injunctive relief against prison officials and requires that any injunctive relief be narrowly drawn and the least intrusive means necessary to correct the harm.  18 U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal*., 220 F.3d 987, 999 (9th Cir. 2000).

1    "The urgency of obtaining a preliminary injunction necessitates a prompt

2    determination" and makes it difficult for a party to procure supporting evidence in a form

3    that would be admissible at trial. *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th

4    Cir. 1984). As a result, "a preliminary injunction is customarily granted on the basis of

5    procedures that are less formal and evidence that is less complete than in a trial on the

6    merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). In addressing a motion

7    for preliminary injunction, a court may consider evidence or developments that postdate

8    the pleadings. *Farmer v. Brennan*, 511 U.S. 825, 846 (1994).

9         When evaluating the merits of a preliminary injunction motion, a court's factual

10    findings and legal conclusions are not binding at trial on the merits. *Camenisch*, 451 U.S.

11    at 395.

12    **III.    Motion for Injunctive Relief to Prevent Transfer/Motion for Order**

13         In his Motion for Injunctive Relief, filed on October 18, 2019, Beitman states that

14    he was advised by ADC security staff and Florence South health unit employees that his

15    filing of this lawsuit is causing "disharmony" within the health unit and among ADC

16    officials. (Doc. 41 at 1.) Beitman fears that he will be relocated to a different South Unit

17    facility, even though the other facilities house high risk and violent prisoners, which

18    would present a risk of harm to Beitman's safety. (*Id.* at 1–2.) He requests an order

19    preventing his transfer out of the Florence South Unit. (*Id.* at 2.) Defendants did not

20    respond to the Motion.

21         "When a plaintiff seeks injunctive relief based on claims not pled in the

22    complaint, the court does not have the authority to issue an injunction." *Pacific

23    Radiation Oncology, LLC v. Queen's Med. Center*, 810 F.3d 631, 633 (9th Cir. 2015). A

24    court should not grant an injunction "when the injunction in question is not of the same

25    character, and deals with a matter lying wholly outside the issues in the suit." *Kaimowitz

26    v. Orlando*, 122 F.3d 41, 43 (11th Cir. 1997). Here, Beitman's injunction request to

27    prevent a retaliatory transfer is unrelated to the basis of his underlying § 1983 claims—

28    Eighth Amendment medical care claims. As such, an injunction is not appropriate.

Even if the Court could properly entertain Beitman's request for a preliminary injunction, he has failed to present any evidence that a transfer is likely. Speculative injury is not irreparable injury sufficient for a preliminary injunction. *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

Accordingly, Beitman's Motion for Injunctive Relief and Motion for Order, which asks the Court to grant the Motion for Injunctive Relief, will be denied.

**IV.     Motion for Retraining Order with Injunctive Relief**

In this Motion, Beitman alleges that NP Hahn is not properly treating Beitman's hormone/low testosterone condition. (Doc. 49.) Beitman seeks an order to restrain NP Hahn from seeing and treating Beitman; an order for Hahn's employer—Centurion—to schedule a telemed appointment with Dr. Sharon Kary, who had previously ordered lab tests for Beitman; and an order to refer Beitman to his outside physician, Dr. Paul Stallone, or to an independent endocrinologist. (*Id.*) NP Hahn opposes the Motion and argues that she is not in a position to provide injunctive relief; that there is no evidence Beitman has been denied appropriate medical care; and that Beitman cannot satisfy any of the *Winter* factors necessary to support an injunction. (Doc. 60.)

**A.     Proper Defendant for Injunctive Relief**

NP Hahn states that she is not able to make determinations regarding injunctive relief and she is named only in her individual capacity. (Doc. 60 at 2.) NP Hahn explains that she is an employee of Centurion, which took over as the contracted healthcare provider in July 2019. (*Id.* at 1.)

Under Federal Rule of Civil Procedure 20, "[p]ersons . . . may be joined in one action as defendants if:

> (A) they assert any right to relief against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and

> (B) any question of law or fact common to all defendants will arise in the action.

- 5 -

Fed. R. Civ. P. 20(a)(2).  Rule 20 "is to be construed liberally in order to promote trial convenience and to expedite the final determination of disputes."  *League to Save Lake Tahoe v. Tahoe Reg'l Planning Agency*, 558 F.2d 916, 917 (9th Cir. 1977).   Other Federal Rules of Civil Procedure also promote the addition of parties when necessary. Rule 21 provides that a court may, on its own initiative and at any time, on just terms, add a party.  And Rule 19 provides that a party must be joined where that party's absence renders the Court unable to afford complete relief among the existing parties.  Fed. R. Civ. P. 19(a)(1)(A).

In his Third Amended Complaint, Beitman requested injunctive relief in the form of medical treatment to repair injuries to his face (relevant to the Count One claim) and medical treatment for spine injuries caused by the denial of adequate medication for his low testosterone and hormone levels (relevant to the Count Two claim).  (Doc. 35 at 9, 15.)   Beitman's pending Motion requests injunctive relief in the form of adequate treatment for his low testosterone, and he requests that Centurion provide specific injunctive relief.  (Doc. 49.)  The Court considers this request for injunctive relief to be related to his Count Two claim.  *See Erickson v. Pardus*, 5551 U.S. 89, 94 (2007) (a pro se litigant may "bolster[] his claim by making more specific allegations . . . in later filings"); *Alvarez v. Hill*, 518 F.3d 1152, 1158 (9th Cir. 2008) (district courts are required to afford a pro se litigant "'the benefit of any doubt' in ascertaining what claims he 'raised in his complaint and *argued to the district court*'").  Centurion is the appropriate Defendant to provide the injunctive relief requested in both Counts One and Two.  Thus, the addition of Centurion as a party satisfies the permissive joinder requirements of the Federal Rules of Civil Procedure.  Accordingly, Centurion will be added as a Defendant.

### B.    Relevant Facts[3]

---

[3] In support of her opposition to Beitman's Motion, NP Hahn submits excerpts of Beitman's medical records from July 2019–December 2019, and the declaration of Dr. Wendy Orm, Statewide Medical Director for Centurion.  (Doc. 60, Exs. A–B.)  Dr. Orm did not treat Beitman; she avers that her declaration is based on a review of Beitman's medical records.  (*Id.*, Ex. B, Orm Decl. ¶ 4 (Doc. 60-2 at 2).)  Dr. Orm's declaration includes statements regarding Beitman's treatment, medical interactions, and lab results

Beitman has received hormone replacement therapy since 1987 due to pituitary trauma suffered in an accident. (Doc. 50, Beitman Decl. ¶ 3.) Prior to his incarceration, Beitman was treated by Scottsdale physician Dr. Paul Stallone, a specialist in hormone replacement therapy. (*Id.* ¶ 6.) Dr. Stallone diagnosed Beitman with pituitary trauma and treated Beitman with testosterone cypionate; micronized DHEA; humatropin (growth hormone); and sermorelin (growth hormone-releasing hormone). (*Id.* ¶ 9.) The ADC medical records show that Beitman is diagnosed with, among other conditions, hypothyroidism (underactive thyroid), testicular hypofunction (declining/low testosterone), and "unspecified injury of head." (Doc. 60-1 at 3–4.)

Beitman was first prescribed testosterone by an ADC provider in January 2018, when lab results showed that his free testosterone was "Below Low Normal." (Doc. 77 at 47.) According to Beitman, he had not been prescribed testosterone for four years prior to this time because ADC failed to properly test his active/free testosterone level. (*Id.* at 5.) During those four years Beitman did not receive proper hormone medication and testosterone replacement, and he suffered testicular atrophy and torn muscles and connective tissue that led to disc deterioration in his lower spine. (Doc. 35 at 9.)

In February 2019, lab results showed that Beitman's free testosterone level was "Below Low Normal." (Doc. 49 at 20.)

On April 11, 2019, Beitman saw NP Hahn for a chronic care appointment. (Doc. 77 at 34.) NP Hahn noted in the medical record that Beitman's "labs have been good,

in 2017 and 2018; however, there are no attached medical records or lab results from those years. (*See id.* ¶¶ 8–13, 19.) Dr. Orm's declaration also includes statements regarding Beitman's treatment in 2019; however, there are no citations to specific medical records that purportedly support her statements, and a review of the attached medical records shows that some of her averments are not supported by any of attached documents, which—as stated—are only excerpts. (*See e.g., id.* ¶¶ 16–17.) This is insufficient. *See Corbin v. Ryan*, No. 09-2677-PHX-JAT (LOA), 2010 WL 3327717, at *2 (D. Ariz. Aug. 24, 2010) (in addressing a motion for preliminary injunction seeking medical equipment, finding that the nurse's declaration submitted by the defendants was not admissible because the nurse did not demonstrate personal knowledge, there were no medical records attached to the declaration, and most of the declaration statements constituted hearsay). Therefore, the Court has relied directly on medical records submitted by the parties, which includes some 2017 and 2018 medical records submitted by Beitman.

1    including his Testosterone levels." (*Id.*) At this encounter, Beitman's weight was

2    documented at 206 pounds. (*Id.*)

3          In July 2019, Beitman was being prescribed testosterone cypionate injections

4    every two weeks, and levothyroxine tablets (thyroid medication) every night. (Doc. 60-1

5    at 73.) On July 11, 2019, NP Hahn entered a medical note documenting that Beitman

6    requested to receive the testosterone injections weekly and to have the thyroid medication

7    decreased. (*Id.* at 72.) NP Hahn noted that labs were needed; testosterone injections will

8    stay biweekly; Beitman's testosterone level will be obtained; and TSH (thyroid

9    stimulating hormone) will be checked and medication changed according to labs. (*Id.*)

10    NP Hahn ordered a free testosterone lab test and a TSH lab test. (*Id.* at 72–73.)

11          On July 21, 2019, labs and a diagnostic panel were ordered. (Doc. 60-1 at 79–81.)

12          The lab results, received at 6:30 a.m. on July 26, 2019, reported that Beitman's

13    free testosterone was 4.0, which was "Below Lower Panic Levels." (Doc. 49 at 19.) The

14    normal range/reference for free testosterone is 7.2–24.0. (*Id.* at 17.)

15          On July 26, 2019, at 9:30 a.m., Beitman saw NP Hahn for a chronic care

16    appointment. (Doc. 60-1 at 67.) According to NP Hahn's notes, Beitman requested that

17    his thyroid medication be decreased, and he stated that he does not take the thyroid

18    medication because it is an unhealthy alternative for him as he used to be on more natural

19    supplements. (*Id.*) NP Hahn explained to Beitman that natural remedies are not offered

20    in prison and she would not decrease his thyroid medication because it regulates every

21    organ in the body. (*Id.*) NP Hahn noted that there would be no changes to medications.

22    (*Id.* at 70.) There is no mention in the medical record of Beitman's lab results showing

23    low testosterone levels. (*See id.* at 67–71.)

24          On October 21, 2019, Beitman had a chronic care appointment via a telemed

25    encounter with NP Sharon Kary. (*Id.* at 59.) Beitman reported his history of pituitary

26    trauma and affected hormone levels. (*Id.*) NP Kary noted that Beitman stopped taking

27    thyroid medication in June 2019 and wishes to take homeopathic medication. (*Id.*) A

28    diagnostic panel and free testosterone labs were ordered, and NP Kary explained the

1    importance of taking his thyroid medication.  (*Id.* at 62.)  A chronic care visit was

2    planned in three months.  (*Id.* at 63.)

3         On October 29, 2019, Beitman had a blood draw for labs, and the results showed

4    that his testosterone was 2.3, which was "Below Low Normal."  (Doc. 49 at 17.)

5         On November 12, 2019, Beitman submitted an Inmate Letter stating that he had

6    seen the telemed practitioner on October 21, 2019, and the practitioner was concerned

7    about Beitman's weight loss, low free testosterone level, and other complications.  (*Id.* at

8    7.)  Beitman wrote that he received the October 29, 2019 lab results indicating that his

9    free testosterone was at just 2.3, despite his regular testosterone injections.  (*Id.*)  Beitman

10   wrote that he is having more problems with cramping and tearing of tissue.  (*Id.*)

11   Beitman explained his concern that NP Hahn cannot be impartial or objective when

12   treating him because she is a defendant in his civil rights lawsuit, and he requested that

13   his lab results be sent to the telemed provider and he be scheduled for follow up with the

14   telemed provider.  (*Id.*)

15        On November 19, 2019, the Director of Nursing, M. Diaz, responded to Beitman's

16   Inmate Letter.  (*Id.* at 8.)  Nurse Diaz informed Beitman that he was scheduled to see the

17   provider who ordered the testosterone labs—referring to the telemed provider.  (*Id.*)

18        On November 26, 2019, Beitman received a second response to his Inmate Letter

19   from Dr. David Robertson, the Medical Program Manager.  (Doc. 77 at 65.)  Dr.

20   Robertson informed Beitman that he received Beitman's letter regarding declining

21   testosterone values and concerns over receiving appropriate care.  (*Id.*)  Dr. Robertson

22   informed Beitman that he can advocate for patient needs when he feels it is appropriate,

23   and that he had forwarded Beitman's letter to the Medical Director of Centurion and

24   expects her to look into the matter and discuss it with Beitman's practitioner.  (*Id.*)

25        Also on November 26, 2019, Beitman went to medical for his telemed

26   appointment, but when he arrived, he learned that there was no telemed appointment.

27   (Doc. 49 at 3.)  Beitman then spoke to Nurse Diaz, who informed Beitman that he was

28   going to see NP Hahn instead.  (*Id.*; Doc. 50, Beitman Decl. ¶ 21.)  At the encounter with

NP Hahn, Beitman reported that he felt like he had lost weight and had fatigue. (Doc. 60-1 at 7.) His weight was documented at 142 pounds. (*Id.* at 8.) According to NP Hahn's notes, Beitman stated that he did not feel the effects of his last testosterone injection, and he reported that prior to incarceration, he received weekly testosterone from a naturopathic physician. (*Id* at 7.) NP Hahn threatened Beitman that she would take away his testosterone if he did not have another lab to test his TSH level and take the thyroid medication at the "watch and swallow" window every day. (Doc. 50, Beitman Decl. ¶ 24.) NP Hahn noted in the record that although Beitman stated that he quit taking his thyroid medication in June, his TSH results were normal, but his testosterone level was low. (Doc. 60-1 at 7.) NP Hahn wrote that she consulted with the Regional Medical Director, who advised that the thyroid medication was to be made DOT—directly observed therapy (i.e., "watch and swallow")—and not to administer testosterone if Beitman does not take the thyroid medication. (*Id.*) NP Hahn also noted that Beitman's records did not include history of pituitary tumor, but that the issue will be explored, and labs and an MRI will be done. (*Id.*) NP Hahn wrote that based on the MRI results, if indicated, an endocrine follow up will be sent. (*Id.*) NP Hahn ordered lab tests, and they were scheduled for December 6, 2019. (*Id.* at 31, 33, 35, 37, 39, 41, 43, 45, 47, 49, 51, 53.) NP Hahn also submitted a consult request for an MRI, priority "urgent," and the medical record shows that the request was authorized. (Doc. 77 at 30.) The lab results and MRI results were not submitted.

At some point after the November 26, 2019 encounter, Beitman stopped seeing NP Hahn, and since he has been treated by a different provider, he has been prescribed Nature-Throid, an all-natural hormone replacement medication. (Doc. 77 at 9, 44.)

## C.    Discussion

### 1.    Likelihood of Success/Serious Questions

To establish a likelihood of success on the merits of an Eighth Amendment medical care claim, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v.*

*Gamble*, 429 U.S. 97, 104 (1976)).  The prisoner must show (1) that his condition constitutes a "serious medical need" and (2) that the defendant's response to that need was deliberately indifferent.  *Jett*, 439 F.3d at 1096.

### a.     Serious Medical Need

Examples of indications that a prisoner has a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds, WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997).

NP Hahn argues that there is no evidence that Beitman is suffering from a serious medical need at this time.  (Doc. 60 at 9.)  NP Hahn also maintains that testosterone hormone replacement is an elective and very expensive treatment and there are no risks to health if it is not given, and that such treatment is unnecessary unless a man has been castrated because of testicular cancer.  (*Id.* at 7–8.)  The evidence shows, however, that Beitman's pituitary trauma and low testosterone conditions have been diagnosed and worthy of treatment including medication, injections, regular testing and monitoring, an order for an MRI, and intervention by the Medical Program Manager and Centurion's Medical Director.  Beitman avers that without proper hormone medication adjustments he has suffered extreme weight loss, muscle cramps, torn tissue, deteriorated discs, and testicular atrophy.  (Doc. 50, Beitman Decl. ¶ 25; Doc. 35 at 9.)  The available medical records document a 64-pound weight loss from April to November 2019.  (Doc. 60-1 at 8; Doc. 77 at 34.)  This record supports the finding of a serious medical need; thus, Beitman satisfies the objective prong of the deliberate indifference analysis.

### b.     Deliberate Indifference

With respect to the second prong, a plaintiff must first show that the defendant was "subjectively aware of the serious medical need[.]" *Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1017–18 (9th Cir. 2010) (quotation and citation omitted).  Then, the

- 11 -

plaintiff mush show (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. *Jett*, 439 F.3d at 1096. A plaintiff may meet the harm requirement by demonstrating that the defendant's actions or policies expose the prisoner to a "substantial risk for serious harm." *Parsons v. Ryan*, 754 F.3d 657, 677 (9th Cir. 2014). A plaintiff need not "await a tragic event" before seeking a remedy. *Farmer*, 511 U.S. at 828.

A defendant's knowledge of a serious medical need or substantial risk to health "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence," and a defendant may be found to have known of a substantial risk if the risk was obvious. *Farmer*, 511 U.S. at 842. There can be no dispute that NP Hahn and Centurion medical staff are aware of Beitman's diagnosed condition and serious medical need because it is documented in his medical records, and those records document that Beitman has been treated for years for low testosterone. Further, the medical records show that in the last year, Beitman's testosterone levels have consistently tested below low normal or "below lower panic levels," and he has lost a significant amount of weight. (Doc. 49 at 17, 19–20; Doc. 60-1 at 8; Doc. 77 at 34.) Beitman also submits evidence that he has used the grievance process to notify medical staff and administrators of his low testosterone levels and need for adequate treatment. (Doc. 49 at 7, 9; Doc. 50, Beitman Decl. ¶ 14.) This evidence is sufficient to demonstrate that medical staff are aware that Beitman suffers low testosterone levels and that he seeks adequate treatment.

After showing that a defendant was subjectively aware of a serious medical need, a plaintiff must show that the defendant "failed to adequately respond" to that need. *Simmons*, 609 F.3d at 1018. Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment." *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir.2002) (internal citations and quotation marks omitted). Deliberate indifference may also be shown "by a purposeful

1    act or failure to respond to a prisoner's pain or possible medical need." *Jett*, 439 F.3d at
2    1096.

3      The medical records show that Beitman has undergone periodic lab tests over the
4    last year to measure his free testosterone levels, and the lab results show that his
5    testosterone levels have been consistently below normal, and even reported at "below
6    lower panic levels." (Doc. 49 at 17, 19–20; Doc. 77 at 47.) The evidence shows that
7    despite lab results showing low levels of testosterone in February 2019, NP Hahn
8    thereafter documented in the medical record that Beitman's "labs have been good,
9    including his Testosterone levels." (Doc. 77 at 34.) The medical records also indicate
10   that, following the July and October 2019 lab results showing below low normal and
11   "below lower panic levels" of free testosterone, and despite Beitman's documented
12   severe weight loss and fatigue, there was no change to Beitman's treatment. This
13   evidence supports that NP Hahn and medical staff ignored or failed to respond to test
14   results confirming Beitman's serious medical need. In her opposition, NP Hahn argues
15   generally that Beitman "simply disagrees with the prison medical providers who have
16   determined that he is receiving appropriate medication and testing to assess and address
17   his Testosterone levels," and that he has been seen and tested regularly, and only had his
18   medications, "including Testosterone, adjusted as medically indicated." (Doc. 60 at 9.)
19   But there is no medical evidence that his Testosterone was adjusted despite the repeated
20   lab results showing low and below lower panic levels of the hormone. The fact that
21   Beitman was seen regularly and repeatedly tested is meaningless if the medical staff
22   failed to respond to the test results and to Beitman's medical need. *See Ortiz v. City of*
23   *Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) ("access to medical staff is meaningless
24   unless that staff is competent and can render competent care"); *see Estelle*, 429 U.S. at
25   105 & n.10 (the treatment received by a prisoner can be so bad that the treatment itself
26   manifests deliberate indifference); *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000)
27   (prisoner does not have to prove that he was completely denied medical care to support
28   deliberate indifference claim).

On this record, at the least, there are serious questions whether NP Hahn's and medical staff's failure to respond to Beitman's confirmed low free testosterone levels constitutes deliberate indifference.  Beitman therefore satisfies the first *Winter* factor. *See Alliance for the Wild Rockies*, 632 F.3d at 1135 (under the sliding-scale test, a court may issue a preliminary injunction if the plaintiff demonstrates "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff"); *see also Republic of the Phil. v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) ("[s]erious questions need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits") (internal quotation omitted).

## 2.    Irreparable Injury

A plaintiff must demonstrate that absent an injunction, he will be exposed to irreparable harm.  *Caribbean Marine Servs. Co.*, 844 F.2d at 674; *see Winter*, 555 U.S. at 22.  To support a mandatory preliminary injunction for specific medical treatment, a plaintiff must demonstrate ongoing harm or the present threat of irreparable injury, not a past injury.  *See Conn. v. Mass.*, 282 U.S. 660, 674 (1931) (an injunction is only appropriate "to prevent existing or presently threatened injuries"); *Caribbean Marine*, 844 F.2d at 674.  "[T]here must be a presently existing threat of harm, although injury need not be certain to occur."  *Villaneuva v. Sisto*, CIV S-06-2706 LKK EFB P, 2008 WL 4467512, at *3 (E.D. Cal. Oct. 3, 2008) (citing *FDIC v. Garner*, 125 F.3d 1272, 1279–80 (9th Cir. 1997)).  Pain can constitute irreparable harm.  *See Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004) (irreparable harm includes delayed and/or complete lack of necessary treatment, and increased pain); *McNearney*, 2012 WL 3545267, at *14 (finding a likelihood of irreparable injury where the plaintiff's medical condition predated her incarceration and had not worsened, but the evidence showed that she continued to suffer unnecessary pain due to the defendants' inadequate treatment plan).

It is troubling that NP Hahn failed to submit the lab results from the December 6, 2019 tests or any medical records documenting medical's response thereto, even though

her Response was not filed until January 3, 2020.  (*See* Doc. 60.)  As to the harm element, Beitman asserts that due to the inadequate treatment from NP Hahn, he has already suffered most of the complications of hypogonadism.  (Doc. 49 at 4.)  He states that "without explaining all the specific complications" he is going through, he seeks injunctive relief to avoid further imminent harm.  (*Id.*)  But explanation of the specific complications is necessary for a determination as to whether there is a threat of irreparable harm.  Beitman avers that the inadequate medication regimen, and the prescribed thyroid medication—Levothyroxine—have caused him to suffer muscle cramps and tearing of connective tissue.  (Doc. 50, Beitman Decl. ¶ 25; Doc. 77 at 5.)  But in his Reply, he explains that he is no longer taking Levothyroxine; instead, he is now prescribed Nature-Throid, and the damaged areas are starting to heal.  (Doc. 77 at 5.)  Beitman also indicates that he is no longer treated by NP Hahn, which was one of the requests in his Motion.  (*Id.* at 9.)

On this limited record, and in light of evidence that NP Hahn no longer treats Beitman, and there has been at least one medication change that has led to improvement in his condition, Beitman fails to demonstrate that he is subject to irreparable harm absent an injunctive order for a telemed appointment or an endocrinologist referral.  The Motion for Restraining Order with Injunctive Relief will therefore be denied without prejudice to refiling.  *See Center for Food Safety v. Vilsack*, 636 F.3d 1166, 1174 (9th Cir. 2011) (because the plaintiffs failed to show they are likely to suffer irreparable harm in the absence of preliminary relief, the court need not address the remaining elements of the preliminary injunction standard).

**IT IS ORDERED:**

(1)    The Clerk of Court must correct the caption on the docket to reflect that the Defendant in this action is "Correct Care Solutions, et al."[4]

---

[4] The original complaint misspelled Correct Care Solutions as "Correct *Clear* Solutions."  (Doc. 1.)  The Third Amended Complaint corrected the spelling to "Correct Care Solutions."  (Doc. 35.)

(2)     The reference to the Magistrate Judge is withdrawn as to Plaintiff's Motion for Injunctive Relief (Doc. 41), Motion for Order (Doc. 44), and Motion for Restraining Order with Injunctive Relief (Doc. 49).

(3)     Plaintiff's Motion for Injunctive Relief (Doc. 41), Motion for Order (Doc. 44), and Motion for Restraining Order with Injunctive Relief (Doc. 49) are **denied**.

(4)     The Clerk of Court must update the docket to add Centurion of Arizona, L.L.C. as a Defendant to this action pursuant to Federal Rule of Civil Procedure 20(a)(2). Further, the Clerk of Court must prepare a service packet and forward it to the United States Marshal Service for service.

(5)     The United States Marshal must, immediately, **personally serve** copies of the Summons, Third Amended Complaint, and this Order upon Centurion of Arizona, L.L.C. pursuant to Federal Rule of Civil Procedure 4(e)(2) at the address below:

> Centurion of Arizona, L.L.C.
>
> c/o Statutory Agent
>
> CT Corporation System
>
> 3800 N. Central Ave Ste 460
>
> Phoenix, Arizona 85012

(6)     Within **3 business days after personal service is effected**, the United States Marshal must file a return of service for Defendant Centurion of Arizona, L.L.C.

(7)     The United States Marshal must retain the Summons, a copy of the Third Amended Complaint, and a copy of this Order for future use.

(8)     Defendant Centurion of Arizona, L.L.C. must **answer** the Third Amended Complaint, or otherwise respond, within **15 days** of service.

(9)     Any answer or response must state the specific Defendant by name on whose behalf it is filed.  The Court may strike any answer, response, or other motion or paper that does not identify the specific Defendant by name on whose behalf it is filed.

1         (10)    The Clerk of Court must electronically send a copy of this Order to Sarah

2    L. Barnes at slb@bowwlaw.com.

3         Dated this 20th day of April, 2020.

James A. Teilborg
Senior United States District Judge

- 17 -