WO                                                                                          JDN

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Lee Michael Beitman,                              No.   CV 17-08229-PCT-JAT (DMF)

                    Plaintiff,

vs.                                               **ORDER**

Correct Care Solutions, et al.,

                    Defendants.

Plaintiff Lee Michael Beitman, who is confined in the Arizona State Prison Complex (ASPC)-Florence, South Unit, brought this pro se civil rights action under 42 U.S.C. § 1983 against Correct Care Solutions (CCS), Centurion of Arizona, LLC (Centurion), and multiple individual medical personnel: Dr. Martin Gruenberg, Dr. D. Schmidt, Nurse Practitioner (NP) Stephanie Herrick, Nurse Amber Norton, NP Dorothy Igwe, and NP Betty Hahn.  (Docs. 35, 90.)[1]  Before the Court are three Motions for Summary Judgment: (1) one filed by CCS, Dr. Gruenberg, NP Herrick, Nurse Norton, and Dr. Schmidt (CCS Defendants) (Doc. 129); (2) one filed by NP Igwe and NP Hahn as to claims that arose pre-July 1, 2019 (Doc. 141); and (3) one filed by Centurion and NP Hahn as to claims that arose post-July 1, 2019—the date Centurion took over as medical provider

---

[1] CCS is the private medical provider contracted to provide medical services at the Central Arizona Correctional Facility (CACF), a private prison in Florence, Arizona that is operated by the GEO Group.  Centurion is the private medical provider contracted to provide medical services at the ASPC-Florence.

(Doc. 137).  All three Motions will be granted in part and denied in part.

## I.   Background

In Count One of his Third Amended Complaint, Beitman alleged that in February 2016, while he was housed at the GEO private prison in Kingman Arizona, he was assaulted by another prisoner and punched in the side of the face, which caused him to suffer a displaced jaw, a pushed-in cheek bone, and severe pain.  (Doc. 35 at 4.)  Beitman alleged that Dr. Schmidt and NP Herrick failed to provide adequate treatment for his injuries and were deliberately indifferent to his serious medical needs, and Beitman further alleged that CCS had customs, policies, and practices to ignore health needs requests; to falsify medical records and keep incomplete records; and to deny specialist care, medical procedures, and medications in part to save money.  (*Id.* at 7–8.)  Beitman requested damages and injunctive relief from Centurion in the form of medical treatment to repair injuries to his face.  (*Id.* at 9, 15; Doc. 90 at 6.)

In Count Two, Beitman alleged that for years he was denied proper medication and proper medication dosages to treat his low testosterone levels despite lab tests and prior medical records confirming his low testosterone levels.  (Doc. 35 at 9–11.)  Beitman alleged that Nurse Norton, Dr. Gruenberg, and then NP Igwe and NP Hahn, all failed to properly treat his hormone condition, and, consequently, Beitman suffered secondary problems including pain, cramping, and spine deterioration.  (*Id.* at 10–11.)  Beitman seeks damages and medical treatment from Centurion for spine injuries caused by the denial of adequate medication for his low testosterone.  (*Id.* at 15; Doc. 90 at 6.)

## II.   Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

1       If the movant fails to carry its initial burden of production, the nonmovant need not
2   produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d
3   1099, 1102–03 (9th Cir. 200).  But if the movant meets its initial responsibility, the burden
4   then shifts to the nonmovant to demonstrate the existence of a factual dispute and that the
5   fact in contention is material, i.e., a fact that might affect the outcome of the suit under the
6   governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable
7   jury could return a verdict for the nonmovant.  *Anderson*, 477 U.S. at 250; *see Triton*
8   *Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need
9   not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v.*
10   *Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with
11   specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.,*
12   *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed.
13   R. Civ. P. 56(c)(1).

14       At summary judgment, the judge's function is not to weigh the evidence and
15   determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*,
16   477 U.S. at 249.  In its analysis, the court does not make credibility determinations; it must
17   believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at
18   255; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  The court need
19   consider only the cited materials, but it may consider any other materials in the record.
20   Fed. R. Civ. P. 56(c)(3).  Further, where the nonmovant is pro se, the court must consider
21   as evidence in opposition to summary judgment all of the pro se litigant's contentions that
22   are based on personal knowledge and that are set forth in verified pleadings and motions.
23   *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004); *Schroeder v. McDonald*, 55 F.3d 454,
24   460 (9th Cir. 1995).

25       Finally, where the plaintiff seeks injunctive relief, the court may also consider
26   developments that postdate the motions to determine whether an injunction is warranted.
27   *Farmer v. Brennan*, 511 U.S. 825, 846 (1994).

28

### III.   Relevant Facts

#### A.   Testosterone Claim at CACF-Florence

Beitman has received hormone replacement therapy since 1987 due to pituitary trauma suffered in an accident.  (Doc. 50, Beitman Decl. ¶ 3.)  Prior to his incarceration, Beitman was treated by Scottsdale physician Dr. Paul Stallone, a specialist in hormone replacement therapy.  (*Id.* ¶ 6.)  Dr. Stallone diagnosed Beitman with pituitary trauma and treated him with testosterone cypionate; micronized DHEA; humatropin (growth hormone); and sermorelin (growth hormone-releasing hormone).  (*Id.* ¶ 9.)

Beitman was initially incarcerated at ASPC-Alhambra in Phoenix on April 25, 2014.  (Doc. 195, Pl.'s Statement of Facts ¶ 3.)  During intake, Beitman explained his existing medical conditions and current medications, and the provider ordered labs for a thyroid panel and testosterone.  (*Id.*; Doc. 195 at 27.)  The May 2, 2014 test results showed that Beitman's free testosterone level was 5.8, which was flagged as abnormally low.  (Doc. 195 at 28–29.)  The normal range for free testosterone is 7.2–24.0.  (*Id.* at 29.)

On May 2, 2014, Beitman was transferred to CACF in Florence, which is operated by GEO.  (*Id.* ¶ 4; Doc. 130, CCA Defs.' Statement of Facts ¶ 12.)  On May 6, 2014, Beitman submitted a Health Needs Request (HNR) informing medical that he had a preexisting condition and needed medication prescribed by his doctor for pituitary trauma caused by seizures.  (Doc. 130-1 at 7.)

The next day, Beitman was seen by medical; he advised medical staff to contact his physician in Scottsdale regarding his labs and treatment for pituitary trauma caused by seizures.  (*Id.* at 10.)  Beitman was informed that he would need to obtain and submit the records from his physician to be able to obtain previously prescribed medication.  (*Id.*; Doc. 130 ¶ 14.)  In the following week, medical staff advised Beitman to provide them with a medical release so that they could obtain Beitman's medical records from Dr. Stallone.  (Doc. 195 at 30.)

On May 15, 2014, lab tests were ordered.  (Doc. 130 ¶ 15.)  But a lab test for free testosterone was not ordered.  (Doc. 160 ¶ 15; Doc. 130-1 at 11.)  The results showed a

thyroid-stimulating hormone (TSH) level of 5.190, which is high.  (*Id.*)[2]

On May 23, 2014, Dr. Crane met with Beitman for a chronic condition follow up, and they discussed the high TSH level, but no thyroid medication was prescribed, and there was no mention of Beitman's low free testosterone level.  (Doc. 195 ¶ 8.)  Dr. Crane reviewed the lab results and ordered that a follow up be conducted at the next regularly scheduled chronic care clinic.  (Doc. 130 ¶¶ 17–18; Doc. 130-1 at 11–12.)

On June 16, 2014, Beitman submitted an Inmate Letter to Nurse Norton stating that on May 6, 2014, he had submitted an HNR to medical concerning his preexisting condition of pituitary trauma and that he received medication from his physician, Dr. Paul Stallone. (Doc. 195 at 30.)  Beitman wrote that the following week, medical staff asked him to provide a medical release so they could get medical records from Dr. Stallone to verify what medication Beitman should be taking.  (*Id.*)  Beitman stated that it had been over 30 days since he provided the medical release, but he had not yet received any medication, and he asked that the issue be addressed ASAP.  (*Id.*)

On June 27, 2014, Beitman was seen on the "MD line" and requested medication for pituitary trauma.  (Doc. 130-1 at 13.)  In the medical record, the nurse referenced the May 2, 2014 lab test results, noting that the combined testosterone level was normal at 298; however, there was no mention of the low free testosterone level documented in the May 2, 2014 lab results.  (*Id.* at 14.)

On August 5, 2014, Beitman submitted another Inmate Letter to Nurse Norton stating that he received confirmation that medical received his medical records from Dr. Stallone a few weeks before, yet Beitman still had not been called to medical to get his medication. (Doc. 195 at 31.)  On August 11, 2014, Nurse Norton issued an Inmate Letter response informing Beitman that he will be called to medical to discuss the issue with a provider.  (*Id.* at 32.)

On August 11, 2014, Beitman saw Dr. Crane.  (Doc. 130-1 at 15.)  Dr. Crane

---

[2] CCS Defendants did not submit a copy of the lab test results; instead, some of the test results were noted in the hand-written medical record.  (Doc. 130-1 at 11.)

documented his assessment of seizure disorder and hypothyroidism (underactive thyroid), and he noted that he reviewed with Beitman his lab results and old records. (*Id.*) But at this encounter, Beitman did not see any of his records from Dr. Stallone nor did he see copies of his May 2, 2014 lab results. (Doc. 195 ¶ 12.) In the plan section of the medical record, Dr. Crane wrote "no change in medication at this time." (Doc. 130-1 at 15.) It is not clear what medications, if any, Beitman was on at the time.

On August 19, 2014, Beitman submitted another Inmate Letter to Nurse Norton stating that he met with Dr. Crane and Dr. Crane told him that Nurse Norton decides if he gets his medication or not. (Doc. 195 at 33.) Beitman requested his medication and wrote that his Eighth Amendment right to medical treatment was being violated. (*Id.*) On August 25, 2014, Nurse Norton issued an Inmate Letter response informing Beitman that he will be called to medical to discuss the issue. (*Id.* at 34.)

On August 29, 2014, Beitman saw Nurse Norton. (Doc. 130-1 at 16.) Beitman explained his condition and the medication he was previously prescribed. (*Id.*) Nurse Norton documented that the medication administration information had not been received from Dr. Stallone's office, so a request will be sent via telephone to his office. (*Id.*) Nurse Norton called Dr. Stallone's office that same day and requested that his office provide Beitman's medical records. (*Id.*; Doc. 130 ¶ 24.)

On September 8, 2014, Beitman submitted an Inmate Letter to Nurse Norton stating that he had seen her 10 days before and she said she would call Dr. Stallone's office to get the listed medications, but to date, he had not heard back from her. (Doc. 195 at 35.) On September 12, 2014, Nurse Norton issued a written response informing Beitman that he would be scheduled to discuss the issue with a provider. (*Id.* at 36.)

On September 24, 2014, Beitman saw Dr. Osteen. (Doc. 130-1 at 17.) Dr. Osteen documented that they discussed Dr. Stallone's treatment and Beitman's past medication, including androgenic steroids and testosterone cypionate. (*Id.*) Dr. Osteen wrote that he advised Beitman that androgenic steroids and homeopathic medicines could not be prescribed at CACF. (*Id.*) But Beitman states that Dr. Osteen never advised him that these

1   medications could not prescribed.  (Doc. 195 ¶ 16.)

2       On October 21, 2014, Beitman saw Dr. Gruenberg.  (Doc. 130-1 at 18; Doc. 130

3   ¶ 28.)   The  medical  record  documents  that  they  discussed  previous  steroid  use  and

4   "alternatives." (Doc. 130-1 at 18.)  Dr. Gruenberg wrote that they "will need medical proof

5   of true disease," and he wrote down the names of Beitman's prior physicians, Dr. Paul

6   Stallone and Dr. Abram Ber, and their phone number.  (*Id.*)  Dr. Gruenberg noted that

7   Beitman "states  they  are  his  physicians  who  prescribed  for  hypopituitary."  (*Id.*)  Dr.

8   Gruenberg states that he advised Beitman that he would need Beitman's prior records

9   before making any medication decisions and that CCS does not prescribe steroids.  (Doc.

10   130 ¶¶ 31, 33.)  Beitman states that Dr. Gruenberg did not advise him of anything.  (Doc.

11   160 ¶¶ 31, 33.)

12       In his declaration, Dr. Gruenberg averred that because of the unusual nature of

13   Beitman's request, he telephoned Dr. Ber and Dr. Stallone, and they told him they believed

14   Beitman was using the prescriptions as anabolic steroids to increase body mass, not for low

15   testosterone or pituitary trauma, and that the medications should not be prescribed.  (Doc.

16   130-1 at 30, Gruenberg Decl. ¶¶ 15–16.)[3]

17       On November 17, 2014, Dr. Gruenberg issued an order for Carafate, an antacid.

18   (Doc. 130-1 at 19.)   A week later, after learning that Carafate was not available, Dr.

19   Gruenberg changed the prescription to a different antacid.  (*Id.* at 21; Doc. 130 ¶ 45.)

20       On November 24, 2014, labs were done, and because Beitman's cholesterol levels

21   were high, Dr. Gruenberg prescribed Zocor, a statin.  (Doc. 130-1 at 20; Doc. 130 ¶ 46.)

22       **B.    Facial Injury Claim at Hualapai Facility-Kingman**

23       On December 30, 2015, Beitman was transferred to the Hualapai facility in

24

25       _____

26   [3] In support of this averment, Dr. Gruenberg cites to the October 21, 2014 medical
    record.  (Doc. 130-1 at 30, Gruenberg Decl. ¶ 15; Doc. 130-1 at 18.)  The medical record
27   is handwritten and difficult to read; however, it documents a telephone call to Drs. Ber and
    Stallone about steroids and notes that "we will not prescribe [illegible]." (Doc. 130-1 at
28   18.)

1  Kingman, which is also operated by GEO.  (Doc. 195 ¶ 29.)

2      On February 1, 2016, at approximately 10:15 a.m., Beitman was assaulted by
3  another prisoner.  (*Id.* ¶ 31.)  Beitman was sitting on his bunk taking a spoonful of food
4  when he was punched on the right side of his face.  (*Id.*)  The force of the punch knocked
5  Beitman off his bunk to the floor and caused blood to pour out of his nose, even though he
6  was not punched in the nose.  (*Id.*)  As blood was pouring out of his nose and down his
7  throat, Beitman stood up but immediately felt dizzy and almost fainted.  (*Id.* ¶ 32.)  A
8  correctional officer was passing by the cell, saw the extent of Beitman's injury, and assisted
9  Beitman to medical.  (*Id.*)

10      Despite gushing blood from his nose, Beitman was made to wait in the waiting room
11  area, and at one point, he fell out of the chair and was assisted into a wheelchair.  (*Id.* ¶ 33.)
12  When he was brought in and examined, Dr. Schmidt grabbed the right side of Beitman's
13  face, which caused Beitman to cry out in pain.  (*Id.* ¶ 34.)  Dr. Schmidt said, "you'll
14  survive."  (*Id.*)  Beitman could feel that his cheek bone was broken and crushed into his
15  sinuses, and he could feel that his top right teeth were hanging lower than his top left teeth.
16  (*Id.*)  He told Dr. Schmidt that he was in a lot of pain and he requested to go to the hospital,
17  but Dr. Schmidt insisted that Beitman would be okay and he did not need to go to the
18  hospital.  (*Id.* ¶ 35.)  Dr. Schmidt documented a scratch on the right upper lip; a small
19  nosebleed, but nose was symmetrical and not swollen; redness and tenderness on right side
20  of face; and some swelling around the right eye.  (Doc. 130-1 at 51.)  Dr. Schmidt ordered
21  that Beitman be housed in the infirmary for 24 hours due to his emotional state and wrote
22  that they will do x-rays on February 4 or 5, 2016.  (*Id.*)  Dr. Schmidt ordered Tylenol,
23  medical ice, and neuro checks.  (*Id.*)

24      Dr. Schmidt examined Beitman again on February 2, 2016.  (Doc. 195 ¶ 39.)  Dr.
25  Schmidt laughed at Beitman's bulging eye and continued to refuse to send Beitman to the
26  hospital.  (*Id.* 40.)  Dr. Schmidt noted orbital swelling and ordered that Beitman stay in
27  medical and get x-rays.  (Doc. 130-1 at 51.)

28      Beitman was kept in the medical infirmary for the next four days.  (Doc. 195 ¶ 37.)

During that time, Beitman was in severe pain, and blood kept seeping down his throat from his sinuses. (*Id.*) He suffered dizziness, throbbing headaches, memory loss, and difficulty concentrating. (*Id.*) When Beitman tried blowing the blood out of his nose so that he could breathe, the air leaked through the hole in his sinus cavity caused by the orbital bone that had punctured it. (*Id.* ¶ 38.) The air went into the surrounding tissue around Beitman's right eye, which cause the eye to blow up and bulge out. (*Id.*) Beitman was in excruciating pain, and repeatedly told the nurses about his pain and suffering. (*Id.* ¶ 39; Doc. 130-1 at 40.)

On February 3, 2016, Beitman was given ice to apply to his eye. (Doc. 130-1 at 41.) On this same day, NP Herrick ordered an x-ray of the facial bones due to blunt trauma on the right side and an old trauma on the left side. (*Id.* at 44.)

On February 4, 2016, x-rays were taken of Beitman's face. (Doc. 195 ¶ 41.) Beitman states that the x-ray technician showed the film to Beitman and pointed out where the x-ray showed new fractures on the right side of Beitman's face and where the x-ray showed old fractures on the left side of Beitman's face. (*Id.*) But the x-ray imaging report for the February 4, 2016 x-ray states that there was no evidence of acute fracture and that bone density was normal. (Doc. 130-1 at 45.) The final impression was "bilateral maxillary sinusitis," and "the orbits and zygomatic arches show no evidence of acute fracture." (*Id.*)

Also on February 4, 2016, NP Herrick ordered an urgent CT scan of Beitman's face, noting right facial trauma on February 1, 2016 and old left facial trauma. (Doc. 130-1 at 43.)

On February 5, 2016, the CT scan was performed. (Doc. 130-1 at 46.) The CT scan results showed "nondisplaced fractures of the lateral wall of the right orbit and anterior and lateral walls of the right maxillary sinus" as well as "mucoperiosteal thickening in the maxillary and ethmoid sinuses bilaterally, consistent with sinusitis." (*Id.*)

On February 5, 2016, when Beitman returned from the CT scan, NP Herrick told him that he would be moved out of the infirmary. (Doc. 195 ¶ 42.) Beitman expressed

concern that it would be dangerous for him to return to the yard, and he told her that he feared for his safety.  (*Id.*)  Therefore, Beitman was moved to the Central Detention Unit, or "the hole."  (*Id.*)

For the next several days, Beitman remained in pain and continued to submit HNRs requesting treatment for his fractures.  (*Id.* ¶ 43.)

On February 10, 2016, NP Herrick submitted an urgent request for an ear, nose, and throat (ENT) consult due to facial pain following an assault injury to face.  (Doc. 130-1 at 47.)

On February 12, 2016, Beitman saw NP Herrick.  (*Id.* at 53; Doc. 195 ¶ 44.)  NP Herrick informed Beitman that he was going to see an ENT specialist and that she was going to get him an appointment with a dentist because his teeth were out of place on the right side.  (Doc. 195 ¶ 44.)

For the next five weeks, Beitman continued to suffer extreme pain and difficulty eating, breathing, and sleeping, and he filed multiple HNRs and emergency grievances seeking treatment, to no avail.  (*Id.* ¶¶ 45–46; Doc. 35 at 7.)  Beitman never saw an ENT specialist or a dentist.  (Doc. 195 ¶ 45.)

On March 22, 2016, Beitman was transferred to the ASPC-Florence, Cook Unit. (*Id.* ¶ 46.)

**C.    Testosterone Claim-South Unit**[4]

---

[4] In support of their Motion for Summary Judgment, NP Igwe and NP Hahn rely on the same January 3, 2020 declaration from Dr. Orm, Centurion Medical Director, that they submitted in response to Beitman's Motion for Preliminary Injunction.  (*See* Doc. 138 ¶ 2, citing Doc. 60, Ex. B, Orm Decl.)  The Court previously found that this declaration from Dr. Orm was insufficient because Dr. Orm did not treat Beitman and had no personal knowledge, so her declaration was based on a review of Beitman's medical records; however, there were no attached medical records nor any citations to specific medical records that purportedly supported her statements.  (Doc. 90 at 6 n.3; *see* Doc. 60, Ex. B, Orm Decl. ¶ 4 (Doc. 60-2 at 2).)  *See Corbin v. Ryan*, No. 09-2677-PHX-JAT (LOA), 2010 WL 3327717, at *2 (D. Ariz. Aug. 24, 2010) (finding that the nurse's declaration submitted by the defendants was not admissible because the nurse did not demonstrate personal knowledge, there were no medical records attached to the declaration, and most of the declaration statements constituted hearsay).  The Court will not consider the deficient declaration from Dr. Orm and instead relies directly on medical records submitted by the parties.

After Beitman arrived at the Cook Unit in 2016, he was repeatedly told that his testosterone levels were normal, even though he suffered pain every day.  (Doc. 35 at 10.)  At some point, Beitman was transferred to the ASPC-Florence South Unit.  (*See* Doc. 142 at 13 (Sept. 2017 med. record from South Unit).)

On September 15, 2017, Beitman saw NP Igwe for complaints of a lump in his breast.  (*Id.*)  Beitman's weight was documented at 174 pounds.  (*Id.*)  Beitman reported that he had a similar episode five years before, and he explained that prior to incarceration, he was taking testosterone, growth hormone, sermorelin, and micronized DHEA as prescribed by a homeopathic physician.  (*Id.*)  Beitman requested an increase in his thyroid medicine because the current dose did not relieve his muscle symptoms, including cramps, aches, and tendon tears.  (*Id.*)  NP Igwe increased Beitman's thyroid medication, Levothyroxine, and she ordered labs to test testosterone levels.  (*Id.* at 15.)

The test results showed that all hormonal panels were within normal limits.  (*Id.* at 28–29.)  However, the labs tested only the total testosterone level; they did not test the free testosterone level.  (*Id.*)[5]

On October 23, 2017, Beitman met with NP Igwe to review the lab results.  (*Id.* at 34.)  NP Igwe wrote in the medical record that, "per pt [patient], b/c [because] he abused hormones and other drugs prior to incarceration, he does not feel 'good.'"  (*Id.*)  Beitman states this is a false statement, and that he only ever took medications as prescribed by physicians.  (Doc. 161 at 4.)  Beitman explained to NP Igwe his medical and testosterone history, and he requested testosterone treatment.  (Doc. 196 ¶ 12; Doc. 142 at 34.)

On October 25, 2017, Beitman submitted an Inmate Letter complaining about his October 23 appointment and NP Igwe's failure to recognize his low testosterone level, and

---

[5] Most of the testosterone in the blood is attached to proteins, but testosterone that is not attached to a protein is called free testosterone.  There are two types of testosterone tests: (1) total testosterone, which measures both attached and free testosterone; and (2) free testosterone, which measures only free testosterone.  Free testosterone can give more information about certain medical conditions.  *See U.S. Nat'l Library of Medicine, MedlinePlus, Testosterone Levels Test*, https://medlineplus.gov/lab-tests/testosterone-levels-test/ (last visited Sept. 9, 2021.)

he explained how it affected his energy and health.  (Doc. 196 at 32.)  The Inmate Letter Response informed Beitman that according to his lab results, his hormone levels were within normal limits and that Corizon will not provide testosterone when labs are within normal limits.  (*Id.* at 33.)

On December 8, 2017, Beitman saw NP Igwe for complaints of seizure, thyroid issues, and reports of body aches.  (Doc. 142 at 38.)  NP Igwe assessed hypothyroidism, dyslipidemia, and seizure.  (*Id.* at 40–41.)  NP Igwe reviewed Beitman's labs with him and, although Beitman repeated his medical history and requested to be placed on testosterone, NP Igwe again stated that because his testosterone level was within normal limits, there was no need for treatment at this time.  (*Id.* at 38, 41; Doc. 196 ¶ 14.)

A few weeks later, Beitman spoke to Nurse Stacy Fenwick, who he identified as the new Assistant Director of Nursing, about his medical issue with testosterone.  (Doc. 196 ¶ 15.)  Nurse Fenwick reviewed Beitman's records, including the 2014 free testosterone labs, which were very low.  (*Id.*)  Nurse Fenwick told Beitman that they would do more lab tests.  (*Id.*)

On January 8, 2018, Nurse Fenwick entered a medical record documenting a "VORB"—verbal order read back from NP Igwe for a free testosterone lab test.  (Doc. 142 at 44–45.)  The January 10, 2018 lab results showed that Beitman's free testosterone was 2.91, which was flagged as "Below Low Normal."  (*Id.* (normal range listed as 4.25–30.37).)

On January 30, 2018, Beitman saw NP Igwe to review the lab results.  (*Id.* at 51.)  At this encounter, Beitman reported muscle cramping and joint cracking.  (*Id.*)  Based on the low free testosterone level, Igwe assessed testicular hypofunction and determined that Beitman needed testosterone replacement.  (*Id.* at 52; Doc. 196 ¶ 17.)  Igwe prescribed testosterone injections, 200 mg 1 ml every four weeks.  (Doc. 142 at 52.)  This was a lower dose than Dr. Stallone had previously prescribed, which was 100 mg .5 ml every week. (Doc. 196 ¶ 18.)

After Beitman received his first injection, he felt a little better for a week, but then

he felt like he was 'going backwards after that." (*Id.* ¶ 19.)  Beitman spoke to Nurse Fenwick and discussed his request for two shots a month so that the same amount of testosterone would be more evenly absorbed into the body.  (*Id.*)  Fenwick scheduled another appointment with NP Igwe.  (*Id.*)

On March 20, 2018, Beitman saw NP Igwe for complaints about depressed mood and weakness and to address his request for testosterone injections every two weeks.  (Doc. 142 at 55.)  Beitman's weight was documented at 180 pounds.  (*Id.*)  In response to Beitman's complaints, NP Igwe increased the testosterone dose to 200 mg 1 ml every two weeks.  (*Id.* at 57.)  NP Igwe refused Beitman's request to spread out the testosterone administration to 200 mg .5 ml every week.  (Doc. 196 ¶ 20.)  NP Igwe also ordered new testosterone lab tests.  (Doc. 142 at 57.)  The May 28, 2018 lab results showed that Beitman's total testosterone and free testosterone were within normal limits.  (*Id.* at 63.)  Based on these results, Igwe determined that no further dose adjustments were needed.  (*Id.* at 64.)

On May 9, 2018, Beitman saw NP Igwe.  (*Id.* at 66.)  Beitman reported that he had not been taking Lipitor (for high cholesterol), and he requested to review the lab test results from blood work taken a few days prior to this appointment.  (*Id.*)[6]  Beitman also requested to be tested for growth hormone levels and for authorization to allow multivitamins and DHEAs to be brought from home for him.  (*Id.*)  NP Igwe discontinued Lipitor since Beitman was refusing the medication.  (*Id.* at 68.)  She also refused to authorize DHEAs and vitamins.  (Doc. 196 ¶ 22.)

During this time, Beitman began to experience testicular atrophy, which he believed could be treated with DHEAs; therefore, he continued to request the supplements and he requested a testicular exam.  (*Id.*)

On June 27, 2018, Beitman saw NP Igwe; Beitman reported muscle cramps and shrinking of his testicles.  (Doc. 142 at 70.)  Beitman asked to discuss non-prescription

---

[6] Defendants did not provide the results from the May 2018 lab tests.  (*See* Doc. 142.)

- 13 -

hormones and micronized DHEA for testicular atrophy.  (*Id.*)  NP Igwe documented in the medical record that she will need to order tests to determine whether there is a need for supplements and that she needs to perform testicular exam "but pt [patient] left prior to exam."  (*Id.* at 72.)  Beitman asserts that this is a false statement and that he requested the testicular exam, but Igwe refused to conduct it.  (Doc. 196 ¶ 22; Doc. 161 at 5.)

On August 13, 2018, Beitman saw NP Igwe.  (Doc. 142 at 74.)  This was a chronic care appointment for seizures, thyroid, and dyslipidemia.  (*Id.*)  NP Igwe noted in the record "no chaperon available for testicular exam"; however, Beitman states that Igwe simply refused to do the testicular exam and that were other nurses available to chaperon.  (Doc. 196 ¶ 24.)  Beitman requested to take testosterone injections every ten days instead of every two weeks.  (Doc. 142 at 74.)  NP Igwe noted that there was no indication for increasing the dose of testosterone or adding DHEA at this time, but that she would request offsite medical records regarding hormonal treatment.  (Doc. 142 at 78.)

On August 28, 2018, Beitman saw NP Igwe.  (*Id.* at 81.)  At this appointment, NP Igwe was reading Beitman's medical records from Dr Stallone's office, but she told Beitman that she was unable to understand the records apart from the lab work.  (*Id.*; Doc. 142 at 81.)[7]  NP Igwe noted in the medical record that Beitman's prior medical records included diagnoses of erectile dysfunction and hypogonadism.  (*Id.*)[8]  NP Igwe also noted that Beitman requested to receive testosterone injections every 10 days, that he requested growth hormone testing, and that he reported shrinking testicles.  (*Id.*)  NP Igwe again refused to give Beitman a testicular exam.  (Doc. 196 ¶ 25.)  In the plan notes, NP Igwe noted lab tests were to be done and that she would do a digital rectal exam and testicular

---

[7] Defendants did not submit the medical records from Dr. Stallone's office.  (*See* Doc. 142.)

[8] Hypogonadism is a condition in which the body does not produce enough of the hormone testosterone or enough sperm.  In adult males, hypogonadism can cause decreased energy, depression, erectile dysfunction, decrease in muscle mass, development of breast tissue, and loss of bone mass.  *See Mayo Clinic Male hypogonadism*, https://www.mayoclinic.org/diseases-conditions/malehypogonadism/        symptoms-causes/syc-20354881 (last visited Sept. 9, 2021).

1   exam at the next visit.  (Doc. 142 at 83.)

2       Meanwhile, in late August 2018, Beitman began experiencing severe muscle
3   cramping in his back and symptoms of a pinched nerve.  (Doc. 196 ¶ 25.)  He stated that
4   NP Igwe discounted his pain and, when she finally showed concern, she prescribed pain
5   medication to which Beitman had told her he was allergic.  (*Id.* ¶¶ 25, 28, 30.)  Beitman
6   asserted that due to extreme pain, he took the medication and then suffered serious side
7   effects, including a swollen throat.  (*Id.* ¶ 31.)  Beitman was bed-ridden for approximately
8   22 days due to the pinched nerve.  (*Id.* ¶ 32.)  A spine x-ray was done on September 6,
9   2018, and the results showed plate degenerative changes at L4–5 and L5–S1 and
10  degenerative joint disease in the lower spine.  (Doc. 196 at 41.)

11      On September 20, 2018, NP Igwe administered a steroid shot for the pain, which
12  was initially effective.  (Doc. 196 ¶¶ 33–34.)

13      Labs were done in September 2018, and the results showed below low normal
14  DHEA and above high normal free testosterone.  (Doc. 142 at 85, 90.)

15      On October 1, 2018, Beitman saw NP Igwe for the testicular exam.  (Doc. 196 ¶ 43;
16  Doc 196 at 52 (Oct. 3, 2018 grievance resp. referencing the Oct. 1, 2018 provider
17  appointment).)[9]  During this exam, NP Igwe merely looked at Beitman's testicles as he
18  tried to explain the extent of atrophy, and he informed her that his testicles were about one-
19  third their normal size.  (*Id.*)  NP Igwe said that she had not seen his base size.  (*Id.*)  NP
20  Igwe then conducted a prostate exam.  (*Id.*)  NP Igwe informed Beitman that his
21  testosterone level was high, to which Beitman responded that the level was elevated
22  because he had not been exercising in the month prior to the lab draw.  (Doc. 196 ¶ 44.)
23  NP Igwe said that she would try to order him DHEA.  (*Id.*)  NP Igwe decreased Beitman's
24  testosterone dose to 200 mg 1 ml once every four weeks instead of every two weeks.  (*Id.*
25  at 93–94; Doc. 196 at 52.)

26  ────────────────

27      [9] Defendants did not submit the medical record for the October 1, 2018 encounter.
    (*See* Doc. 142.)  Nor was this medical record provided to Beitman; he asserts that this
28  medical record was removed/deleted after he filed a grievance on October 8, 2018.  (Doc.
    196 ¶ 44.)

On October 4, 2018, Beitman saw Nurse Owiti, who explained that, due to Beitman's lab results, his testosterone order was revised to administration once every four weeks.  (Doc. 142 at 99.)  Beitman explained that the labs were skewed because they were done when he was not working out due to his back pain, which resulted in an elevated level of testosterone.  (*Id.*)  Beitman requested that the labs be redone.  (*Id.*)

On October 25, 2018, Beitman saw NP Igwe.  (*Id.* at 103.)  Beitman reported body aches and that the monthly testosterone dosing did not provide adequate coverage, and he requested splitting the injections into once weekly doses.  (*Id.*)  Beitman again requested DHEA supplements.  (*Id.*)  NP Igwe noted a plan to test testosterone levels before the next injection and to administer testosterone injections every two weeks.  (*Id.* at 105.)

November 7, 2018 lab results showed that Beitman's total testosterone and free testosterone levels were with within normal limits.  (Doc. 142 at 114.)

On November 7, 2018, Beitman submitted an HNR stating that he needed a .5 ml testosterone injection every week, not every two weeks, and that he continued to experience pulled muscles and tendons.  (*Id.* at 120.)  Beitman submitted another HNR on November 18, 2018, repeating the same request to spread out his testosterone injections weekly.  (*Id.* at 122.)

On November 29, 2018, Beitman saw NP Hahn for the first time.  (Doc. 142 at 131; Doc. 196 ¶ 52.)  Beitman's weight was documented at 161 pounds.  (Doc. 142 at 131.)  The first thing NP Hahn said to Beitman was "I'm not giving you more testosterone."  (Doc. 196 ¶ 52.)  NP Hahn documented that Beitman was argumentative about the testosterone dosing and felt that it should be increased and administered weekly.  (Doc. 142 at 131.)  NP Hahn documented that the plan was to get monthly testosterone levels and "adjust medication accordingly," and that they discussed the dangers of increasing testosterone, including blood clots.  (*Id.* at 133.)

On December 9, 2018, a blood draw was done, and results shows that total testosterone and free testosterone were within normal limits.  (*Id.* at 136.)

On December 13, 2018, Beitman saw NP Hahn for dry, patchy skin and concerns

about skin cancer (Doc. 142-1 at 2; Doc. 196 ¶ 55.)  Beitman also requested more testosterone because he was suffering muscle cramps; Hahn refused to increase the testosterone dose.  (*Id.*)

On January 8, 2019, another blood draw was done, and the results showed that total testosterone and free testosterone were within normal limits.  (Doc. 142-1 at 7.)

On February 2, 2019, Beitman submitted an HNR stating that he had burning acid reflux, which caused his sinuses to drain, and that he had a fever for the last week as well as a cough and exhaustion.  (*Id.* at 29.)  Beitman complained that he was exhausted and did not want to take pills that hurt his stomach.  (*Id.*)

On February 12, 2019, a blood draw was done, and the results showed that total testosterone was within normal limits, but free testosterone was 21.44, which was flagged as "Below Low Normal."  (*Id.* at 10 (normal range/reference 30.00–150.00).)  Around this time, Beitman's hormone levels were fluctuating, which he states caused muscle cramps and aggravated his acid reflux and caused him to vomit 3–4 nights a week.  (Doc. 196 ¶¶ 57–58.)

On February 15, 2019, an Incident Command Response was initiated in response to a seizure; Beitman was seen in his bed vomiting and convulsing, and then he fell out of bed and hit his head on the floor.  (Doc. 142-1 at 13–14.)  Beitman states that his seizures are caused by lack of sleep.  (Doc. 196 ¶ 59.)  Beitman was taken to medical and then housed in the infirmary for 24 hours.  (Doc. 142-1 at 14.)

On February 18, 2019, Beitman submitted an HNR requesting a helmet for his seizures.  (*Id.* at 32.)

On March 1, 2019, Beitman saw NP Hahn for follow up after his seizure.  (*Id.* at 21.)  Beitman's weight was documented at 161 pounds.  (*Id.*)  NP Hahn noted that Beitman had suffered a grand mal seizure and sustained a laceration, but no sutures were needed, and Beitman reported feeling fine now.  (*Id.*)  Beitman stated that he does not report his seizures and does not take medication for them due to the side effects.  (*Id.*)  Beitman requested pituitary testing.  (*Id.*)  NP Hahn ordered a skull x-ray and a special needs order

for a helmet.  (*Id.* at 23.)

On March 9, 2019, Beitman submitted an HNR stating that his testosterone needed to be renewed and ordered.  (*Id.* at 37.)

On March 11, 2019, a blood draw was done, and the results showed that Beitman's parathyroid hormone was within normal limits.  (*Id.* at 26.)

On March 21, 2019, Beitman submitted an HNR stating that the exophthalmos (bulging) of his right eye, caused by an improperly healed fractured orbital, was worsening, his eye was drying out, and he had pressure headaches.  (*Id.* at 39.)  Beitman requested an optometry appointment.  (*Id.*)

On April 11, 2019, Beitman met with NP Hahn.  (*Id.* at 41.)  NP Hahn reviewed Beitman's lab results and noted that an allergy test was negative for food and environmental allergies, and his labs have been good, including testosterone levels.  (*Id.* at 41.)  Hahn did not inform Beitman of the February 12, 2019 lab results showing that free testosterone was below normal limits.  (Doc. 196 ¶ 64.)

During May and June 2019, Beitman did not have any provider appointments; however, he spoke with Nurse Fenwick about his concerns that his testosterone dosage was too low.  (*Id.* ¶ 62; Doc. 162 at 4.)  In June, Nurse Fenwick informed Beitman that NP Hahn refused to change his dosage.  (Doc. 196 ¶ 62; Doc. 196 at 61–62.)

On July 1, 2019, Centurion took over as the contracted health care provider.  At this time, Beitman was being prescribed testosterone cypionate injections every two weeks, and levothyroxine tablets (thyroid medication) every night.  (Doc. 60-1 at 73.)

On July 11, 2019, NP Hahn entered a medical note documenting that Beitman requested to receive the testosterone injections weekly and to have the thyroid medication decreased.  (Doc. 60-1 at 72.)  Hahn noted that labs were needed, testosterone injections would stay biweekly, Beitman's testosterone level would be obtained, TSH would be checked, and medication would be changed accordingly.  (*Id.*)

On July 21, 2019, labs and a diagnostic panel were ordered.  (*Id.* at 79–81.)  The results, received at 6:30 a.m. on July 26, 2019, showed that Beitman's free testosterone

1   was 4.0, which was flagged as "Below Lower Panic Levels." (Doc. 49 at 19.) The normal

2   range/reference for free testosterone is 7.2–24.0. (*Id.* at 17.)

3   On July 26, 2019, around 2:30 p.m., Beitman saw NP Hahn for a chronic care

4   appointment. (Doc. 60-1 at 67.) At this encounter, Beitman's weight was documented at

5   150 pounds. (*Id.*) According to NP Hahn's notes, Beitman requested that his thyroid

6   medication be decreased, and he stated that he does not take the thyroid medication because

7   it is an unhealthy alternative for him as he used to be on more natural supplements. (*Id.*)

8   NP Hahn explained to Beitman that natural remedies are not offered in prison and she

9   would not decrease his thyroid medication because it regulates every organ in the body.

10  (*Id.*) She explained that not taking the thyroid medication could cause low testosterone.

11  (*Id.* at 70.) NP Hahn did not inform Beitman of that morning's test results showing that

12  his free testosterone levels were "Below Lower Panic Levels." (Doc. 162 at 4–5.) NP

13  Hahn noted that there would be no changes to medication, and a new diagnostic panel

14  would be ordered in 180 days. (Doc. 60-1 at 70.)

15  On August 14, 2019, Beitman submitted an Informal Complaint stating that for

16  months he had been complaining of muscle cramps, pinched nerves in his back, and pain

17  in his hips, legs, and shoulders. (Doc. 196 at 59.) He wrote that he had asked for

18  adjustments to his testosterone because it "roller-coastered" and caused him problems.

19  (*Id.*) He also wrote that he just learned that his recent free testosterone labs showed his

20  levels were "Below Lower Panic Levels," yet NP Hahn had not informed him of these

21  results at his recent chronic care appointment. (*Id.*)[10] Beitman asked that his testosterone

22  medication be increased. (*Id.*)

23  On August 29, 2019, attorneys from the Prison Law Office in San Quentin,

24  California, wrote a letter to ADC's legal counsel regarding Beitman's need for medical

25  care because Beitman was a class member in the ongoing *Parsons v. Ryan* class action

---

[10] Beitman explained in the Informal Complaint that he had just received copies of his medical records from Defendants' counsel and thus became aware of all his lab test results. (Doc. 196 at 59.)

lawsuit against ADC.  (Doc. 196 at 56, ref. to Case No. 2:12-cv-00601.)  The letter stated that Beitman was a class member with testicular hypofunction, and it cited to Beitman's July 2019 lab results showing that Beitman had "Below Lower Panic Levels" of free testosterone.  (*Id.*)  The letter went on to note that the July 26, 2019 chronic care appointment did not appear to cover this concern, that the only order entered was for additional labs in 180 days, and that there was no mention of what treatment Beitman would be provided to address his low testosterone levels.  (*Id.*)

On September 14, 2019, Beitman filed an Inmate Grievance, in which he wrote that for months he had been complaining of muscle cramps, pinched nerves in his back, and pain in his hips, legs, and shoulders.  (Doc. 196 at 61.)  He repeated that he recently learned of the lab results showing low free testosterone and that there has been no change to his treatment.  (*Id.* at 62.)

On September 17, 2019, Nurse Fenwick issued a response to Beitman's August 14, 2019 Informal Complaint, and she informed Beitman that "the Health Care Provider at South Unit has been following your labs very carefully.  She has made the decision to keep your doses where they are.  You do not have the right to dictate care."  (*Id.* at 60.)

On October 21, 2019, Beitman had a chronic care appointment via a telemed encounter with NP Sharon Kary.  (Doc. 60-1 at 59–60.)  Beitman's weight was documented at 146 pounds.  (*Id.* at 60.)  Beitman reported his history of pituitary trauma and affected hormone levels.  (*Id.* at 59–60.)  NP Kary noted that Beitman stopped taking thyroid medication in June 2019 and wished to take homeopathic medication.  (*Id.*)  A diagnostic panel and free testosterone labs were ordered, and NP Kary explained the importance of taking his thyroid medication.  (*Id.* at 62.)  A chronic care visit was planned in three months.  (*Id.* at 63.)

On October 29, 2019, Beitman had a blood draw for labs, and the results showed that his free testosterone was 2.3, which was "Below Low Normal."  (Doc. 49 at 17.)

On November 12, 2019, Beitman submitted an Inmate Letter stating that he had seen the telemed practitioner on October 21, 2019, and the practitioner was concerned

- 20 -

about Beitman's weight loss, low free testosterone level, and other complications.  (*Id.* at 7.)  Beitman wrote that he received the October 29, 2019 lab results indicating that his free testosterone was at just 2.3, despite his regular testosterone injections.  (*Id.*)  Beitman wrote that he is having more problems with cramping and tearing of tissue.  (*Id.*)  Beitman explained his concern that NP Hahn cannot be impartial or objective when treating him because she is a defendant in his civil rights lawsuit, and he requested that his lab results be sent to the telemed provider and he be scheduled for follow up with the telemed provider.  (*Id.*)

On November 19, 2019, the Director of Nursing, M. Diaz, responded to Beitman's Inmate Letter.  (*Id.* at 8.)  Nurse Diaz informed Beitman that he was scheduled to see the provider who ordered the testosterone labs—referring to the telemed provider.  (*Id.*)

On November 26, 2019, Beitman received a second response to his Inmate Letter from Dr. David Robertson, the Medical Program Manager.  (Doc. 77 at 65.)  Dr. Robertson informed Beitman that he received Beitman's letter regarding declining testosterone values and concerns over receiving appropriate care.  (*Id.*)  Dr. Robertson informed Beitman that he can advocate for patient needs when he feels it is appropriate, and that he had forwarded Beitman's letter to the Medical Director of Centurion and expected her to look into the matter and discuss it with Beitman's practitioner.  (*Id.*)

Also on November 26, 2019, Beitman went to medical for his telemed appointment, but when he arrived, he learned that there was no telemed appointment.  (Doc. 49 at 3.)  Beitman was informed that he was going to see NP Hahn instead.  (*Id.*; Doc. 50, Beitman Decl. ¶ 21.)  At the encounter with NP Hahn, Beitman reported that he felt like he had lost weight and had fatigue.  (Doc. 60-1 at 7.)  His weight was documented at 142 pounds.  (*Id.* at 8.)  According to NP Hahn's notes, Beitman stated that he did not feel the effects of his last testosterone injection, and he reported that prior to incarceration, he received weekly testosterone from a naturopathic physician.  (*Id* at 7.)  NP Hahn threatened Beitman that she would take away his testosterone if he did not have another lab to test his TSH level and take the thyroid medication at the "watch and swallow" window every day.  (Doc. 50,

Beitman Decl. ¶ 24.)  NP Hahn noted in the record that although Beitman stated that he quit taking his thyroid medication in June, his TSH results were normal, but his testosterone level was low.  (Doc. 60-1 at 7.)  NP Hahn wrote that she consulted with the Regional Medical Director, who advised that the thyroid medication was to be made DOT—directly observed therapy (i.e., "watch and swallow")—and not to administer testosterone if Beitman does not take the thyroid medication.  (*Id.*)  NP Hahn also noted that Beitman's records did not include history of pituitary tumor, but that the issue will be explored, and labs and an MRI will be done.  (*Id.*)  NP Hahn wrote that based on the MRI results, if indicated, an endocrine consult will be sent.  (*Id.*)  NP Hahn ordered lab tests, and they were scheduled for December 6, 2019.  (*Id.* at 31–53.)  NP Hahn also submitted a consult request for an MRI, priority "urgent," and the medical record shows that the request was authorized.  (Doc. 77 at 30.)

On December 31, 2019, Beitman had a brain MRI.  (Doc. 138-1 at 19.)  The impression from the MRI stated:

> 1. No evidence of acute intracranial pathology.  No etiology for patient's symptoms identified.
>
> 2. Minimal nonspecific white matter changes.  The differential diagnosis includes prior trauma or migraine vasculopathy.
>
> 3. Chronic pansinusitis.

(*Id.*)

Defendants did not submit records from lab tests done on December 6, 2019.  (*See* Doc. 138.)  But on January 21, 2020, another blood draw was done, and the results showed free testosterone was .59, which was flagged as "Below Low Normal," and TSH was 4.757, which was flagged as "Above High Normal."  (Doc. 138-1 at 15.)

At some point after his last appointment with NP Hahn, Beitman was prescribed Nature-Throid tablets.  (Doc. 77 at 9, 44.)

On February 10, 2020, Beitman saw NP Weigel, who reviewed the MRI results with him.  (Doc. 138-1 at 21.)  Beitman asked about his fractured facial bones, and Weigel

- 22 -

explained the MRI focused on his brain, not his facial bones.  (*Id.*)

In March 2020, NP Weigel placed an order for testosterone cypionate injectable solution, to be administered weekly, and noted that Beitman has a history of hypogonadism since age 17.  (*Id.* at 24–25.)  The Medical Administration Record shows that Beitman received weekly testosterone injections from March 27, 2020 to July 4, 2020.  (*Id.*)

On April 1, 2020, Beitman submitted an HNR asking medical why they stopped his Nature-Throid tablets, as this medication helped him heal and he was doing well with it; he requested that the Nature-Throid be restarted.  (Doc. 138-1 at 27.)  The response, dated April 2, 2020, informed Beitman that the medication had been accepted at the pharmacy. (*Id.*)

On June 13, 2020, Beitman submitted an HNR stating that because his testicular atrophy was not treated, he had dramatically reduced function, and he asked for micronized DHEA and human chorionic gonadotropin to stop the reduction.  (*Id.* at 32.)  Beitman was seen by a nurse the following day and referred to a provider.  (*Id.* at 34, 36.)

On June 24, 2020, Beitman saw NP Weigel for testicular atrophy/dysfunction.  (*Id.* at 39.)  The plan was to add DHEA supplements.  (*Id.* at 40.)

Meanwhile, NP Weigel entered a new order for the testosterone cypionate injectable solution, and the Medical Administration Record shows that Beitman was administered testosterone weekly from July 18 to November 7, 2020.  (*Id.* at 44.)

On August 17, 2020, Beitman submitted an HNR stating that he needed his DHEA supplement twice a day, not once a day.  (Doc. 138-2 at 2.)  He wrote that he has been taking his DHEA supplement twice a day for the last seven days to verify that the dosage works.  (*Id.*)

On August 21, 2020, lab tests were done, and results showed high cholesterol, "Above High Normal" red blood cells, and "above High Normal" TSH.  (*Id.* at 6–7.)

On September 1, 2020, Beitman saw Dr. Daniel Pacheco via telemed.  (*Id.* at 13.) Beitman reported that he felt pretty good, no recent seizures, and he felt that his thyroid was at baseline.  (*Id.* at 13.)  Beitman's weight was documented at 153 pounds.  (*Id.* at 14.)

Dr. Pacheco noted that the DHEA supplement appeared to have been changed to twice a day on August 25, 2020.  (*Id.* at 15.)  Dr. Pacheco documented that they reviewed the lab results, and the plan was to monitor Beitman's seizure condition, to repeat labs, and schedule follow up.  (*Id.* at 15.)

On September 3, 2020, Beitman submitted an HNR stating that the telemed doctor had told him that the DHEA was changed to twice a day but that he was still not receiving it and he was about to run out.  (*Id.* at 18.)

On September 4, 2020, NP Weigel placed the order for DHEA capsules to be taken twice a day.  (*Id.* at 21.)

**IV.    Statute of Limitations**

**A.    Governing Standard**

Section 1983 does not include its own statute of limitations.  *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999).  Federal courts apply the statute of limitations governing personal injury claims in the forum state.  *Butler v. Nat'l Cmty. Renaissance of Cal.*, 766 F.3d 1191, 1198 (9th Cir. 2014).   In Arizona, the limitations period for personal injury claims is two years.  *Marks v. Parra*, 785 F.2d 1419, 1420 (9th Cir. 1986); *see* Ariz. Rev. Stat. § 12-542.

Although the statute of limitations applicable to § 1983 claims is borrowed from state law, federal law continues to govern when a § 1983 claim accrues.  *Wallace v. Kato*, 549 U.S. 384, 388 (2007); *TwoRivers*, 174 F.3d at 991.  Under federal law, a claim accrues "when the plaintiff knows or has reason to know of the injury" that is the basis of the claim. *Lukovsky v. City & Cnty. of S.F.*, 535 F.3d 1044, 1048 (9th Cir. 2008) (internal quotation marks omitted).  The Court must apply any state rule for tolling to actions brought under § 1983.  *Hardin v. Straub*, 490 U.S. 536, 544 (1989); *Johnson v. State of Cal.*, 207 F.3d 650, 653 (9th Cir. 2000); *TwoRivers*, 174 F.3d at 992.  In prisoner § 1983 cases, "the applicable statute of limitations must be tolled while a prisoner completes the mandatory exhaustion process."  *Brown v. Valoff*, 422 F.3d 926, 942–43 (9th Cir. 2005).

1

### B. Discussion

CCS Defendants argue that the claims against Nurse Norton and Dr. Gruenberg are barred by the applicable statute of limitations.  (Doc. 129 at 11.)  They assert that Nurse Norton provided services to Beitman in August 2014, and Dr. Gruenberg provided services in October 2014—more than two years before Beitman initiated this action in November 2017.  (Doc. 129 at 11.)

In his amended pleading, Beitman specifically averred that he exhausted every level of the administrative remedies available for his claims against Nurse Norton and Dr. Gruenberg.  (Doc. 35 at 9.)  Defendants wholly fail to address the tolling requirement.  (*See* Docs. 129, 171.)  Consequently, it is unclear how long the statute of limitations must be tolled in this case, and the Court cannot conclude that the claims against Nurse Norton and Dr. Gruenberg are time-barred.  Summary judgment on this basis will be denied.

### V. Eighth Amendment

### A. Governing Standard

To support a medical care claim under the Eighth Amendment, a prisoner must demonstrate "deliberate indifference to serious medical needs."  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  There are two prongs to the deliberate-indifference analysis: an objective standard and a subjective standard.  First, a prisoner must show a "serious medical need."  *Id.* (citations omitted).  A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'"  *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted).  Examples of indications that a prisoner has a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain."  *Id.* at 1059–60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent.   *Jett*, 439 F.3d at 1096.   "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they 'deny, delay or intentionally interfere with medical treatment.'"   *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988)). Deliberate indifference may also be shown where prison officials fail to respond to a prisoner's pain or possible medical need.  *Jett*, 439 F.3d at 1096.

Even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference.  *Jett*, 439 F.3d at 1096; *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful.

## B.   CCS Defendants

### 1.   Serious Medical Need

CCS Defendants do not expressly argue that Beitman did not demonstrate a serious medical need.  (*See* Doc. 129.)  The Court previously found that Beitman demonstrated a serious medical need related to his low testosterone.  (Doc. 90 at 11.)  The expanded summary judgment record does not alter that finding.  The medical records document that Beitman was diagnosed with hypogonadism at age 17.  (Doc. 77 at 25.)  Beitman avers that without proper treatment, he suffers weight loss, muscle cramps, torn tissue, deteriorated discs, and testicular atrophy.  (Doc. 50, Beitman Decl. ¶ 25; Doc. 196 ¶ 22; Doc. 196 at 41; Doc. 142 at 38, 70.)  On this record, Beitman satisfies the objective prong showing with respect to his low testosterone condition.

As to Beitman's facial injuries suffered in 2016, the medical records show that these injuries were worthy of extensive treatment—examinations, neuro checks, placement in the infirmary, x-rays, a CT scan, and an ENT specialist referral.  (Doc. 130-1 at 41, 45–47, 51.)  The CT scan confirmed non-displaced factures of the face.  (*Id.* at 46.)  *See Al-Zerjawi v. Kline*, No. 4:15CV2512, 2018 WL 1553768, at *8 (N.D. Ohio March 29, 2018) (broken facial bones present a serious medical need).   Beitman also suffered extreme pain,

disfigurement, dizziness, headaches, and memory loss.  (Doc. 195 ¶¶ 35, 37–39, 43.)  This evidence supports that the 2016 facial injuries constituted a serious medical need.

## 2. Deliberate Indifference

The inquiry into a defendant's liability for deliberate indifference "must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation."  *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988); *see Rizzo v. Goode*, 423 U.S. 362, 370–71, 375–77 (1976).

### a. Dr. Gruenberg

Dr. Gruenberg saw Beitman on October 21, 2014.  (Doc. 130-1 at 18.)  The Court infers that Dr. Gruenberg was aware of the May 2, 2014 lab results showing low free testosterone, he was aware of the HNR informing medical of Beitman's preexisting condition and need for medication, and he was aware of a prior medical record documenting Beitman's condition and request for treatment.  (Doc. 130-1 at 7, 10.)  *See Jett*, 439 F.3d at 1094, 1097 (a plaintiff opposing summary judgment is entitled to an inference that the defendant prison doctor was aware of the medical slips the plaintiff continued to submit asking to be sent to a specialist for treatment for a fractured thumb).  Dr. Gruenberg did not consider the low free testosterone reading; in fact, he averred that he did not see anything in the lab results that would indicate testosterone was medically necessary.  (Doc. 130-1 at 30, Gruenberg Decl. ¶ 20.)  This suggests that Dr. Gruenberg was unfamiliar with hypogonadism and not competent to treat a condition related to low testosterone.  But neither incompetence nor negligence in diagnosing or treating a medical condition are sufficient to support a constitutional violation.  *Estelle*, 429 U.S. at 106; *Montague v. Jackson*, No.: 2:16-cv-01680-JAD-CWH, 2018 WL 11241971, at *3 (D. Nev. April 26, 2018) (neither incompetence nor negligence are sufficient to show deliberate indifference); *see also Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (a prison doctor's incompetence does not rise to a constitutional violation).  Even gross negligence is insufficient to establish deliberate indifference to serious medical needs.  *See Wood*, 900

1    F.2d at 1334.

2         It was reasonable for Dr. Gruenberg to rely on the information gleaned from the

3    telephone call to Beitman's former physicians when he decided not to prescribe

4    testosterone. (*See* Doc. 130 at 30, Gruenberg Decl. ¶¶ 15–16.)  The record shows, however,

5    that Dr. Gruenberg did not consider any alternative treatment for Beitman's condition.

6    Even so, this would only constitute negligence or gross negligence.

7         If Dr. Gruenberg had continued to see Beitman and failed respond to worsening

8    symptoms and repeated lab tests showing low free testosterone, such a failure to act could

9    rise to deliberate indifference.  *See McGuckin*, 974 F.2d at 1060–61 (repeated failure to

10   properly treat a prisoner or a single failure that is egregious strongly suggests deliberate

11   indifference); *Wood*, 900 F.2d at 1334 ("[i]n determining deliberate indifference, we

12   scrutinize the particular facts and look for substantial indifference in the individual case,

13   indicating more than mere negligence or isolated occurrences of neglect").  But there is no

14   dispute that Dr. Gruenberg had no further interactions with Beitman regarding his

15   testosterone issue after the October 21, 2014 appointment.  (Doc. 130 ¶ 47; Doc. 160 at

16   11.)

17        On this record, there is no genuine issue of material fact as to whether Dr. Gruenberg

18   was deliberately indifferent to Beitman's serious medical need.  Summary judgment will

19   be granted in favor of Dr. Gruenberg.

20                    **b.    Nurse Norton**

21        Nurse Norton is a registered nurse who was employed as the Health Services

22   Administrator.  (Doc. 130-1 at 3, Norton Decl. ¶¶ 1, 10.)   In this role, Norton was

23   responsible for ensuring that nurses or physicians saw prisoners who sought medical

24   treatment and made sure that providers' orders were followed.  (*Id.* ¶ 11.)  As a registered

25   nurse, Norton was not authorized to prescribe medication; she could only make a record of

26   medical complaints submitted by a prisoner, identify a plan to address the complaint, make

27   a referral to a provider, and review medical records.  (*Id.* ¶ 17.)

28        Beitman does not dispute that Nurse Norton could not prescribe medication or

1    instruct medical staff to provide any treatment other than that ordered by providers.  (Doc.

2    130 ¶¶ 6, 8; Doc. 160 at 6.)  The record shows that Norton timely responded to Beitman's

3    Inmate Letters and scheduled him for medical visits.  (Doc. 195 at 32, 34, 36.)  Beitman

4    alleges that Nurse Norton attested falsely as to the number of personal encounters they had

5    and as to information she provided him regarding his prior records and lab results.  (Doc.

6    195 ¶¶ 18, 20.)  But there is no evidence that, even assuming these allegations are true,

7    there was any effect on Beitman's treatment given that Norton was not authorized to

8    prescribe medication or any particular type of treatment.

9         Beitman also alleges that Norton failed to timely obtain his prior medical records

10   because it took her four months to obtain a fax number to enable sending a signed medical

11   release for his records.  (Doc. 195 ¶ 23.)  The evidence shows that a medical release was

12   sent to Beitman's prior physician in June 2014, and Beitman does not dispute that Norton

13   subsequently contacted Dr. Stallone's office by telephone to request the records.  (Doc.

14   130-1 at 14; Doc. 130 ¶¶ 23–24; Doc. 160 at 8.)  Even if Norton was delinquent in not

15   obtaining Beitman's prior records sooner, this amounts to incompetence or negligence, not

16   deliberate indifference.

17        In short, the evidence fails to show a genuine issue of material fact as to whether

18   Nurse Norton was deliberately indifferent to Beitman's serious medical need.  Summary

19   judgment will be granted in favor of Nurse Norton.

20             **c.    Dr. Schmidt**

21        Dr. Schmidt examined Beitman on February 1, 2016, the day he suffered an injury

22   to his face after an assault by another prisoner.  Beitman alleges that Dr. Schmidt caused

23   pain during the initial examination when he grabbed Beitman's face and that Dr. Schmidt

24   acted callously towards Beitman's pain.  (Doc. 195 ¶ 34.)  Even though Dr. Schmidt was

25   unprofessional and demonstrated a poor bedside manner, such conduct does not rise to

26   deliberate indifference.  *See Williams v. Elyea*, 163 F. Supp. 2d 992, 999 (N.D. Ill. 2001)

27   (callous bedside manner falls short of unconstitutional indifference).  There is no dispute

28   that at this first visit, Dr. Schmidt ordered Beitman to stay in the infirmary overnight,

ordered x-rays to be take a few days later after swelling went down, ordered regular neuro checks, and prescribed Tylenol and ice.  (Doc. 130 ¶¶ 56–57; Doc. 130-1 at 51; Doc. 160 at 12.)  To the extent that Beitman disagrees with Dr. Schmidt's decision to delay x-rays for a few days, that amounts to a difference of opinion, which fails to support a constitutional violation.  *See Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

Dr. Schmidt then examined Beitman again the following day and ordered Beitman to remain in the infirmary for three more days.  (Doc. 160 at 12.)  Beitman does not dispute that he had no further encounters with Dr. Schmidt.  (*Id.*)  The two encounters with Dr. Schmidt are insufficient to support an Eighth Amendment claim, even if the evidence supported that Dr. Schmidt acted negligently at those encounters.  *See Estelle*, 429 U.S. at 106; *McGuckin*, 974 F.2d at 1060–61; *Wood*, 900 F.2d at 1334.

Accordingly, there exists no genuine issue of material fact as to whether Dr. Schmidt acted with deliberate indifference to Beitman's serious medical need.  Summary judgment will be granted in favor of Dr. Schmidt.

### d.    NP Herrick

NP Herrick took over Beitman's care on February 4, 2016, and the record shows that she immediately scheduled x-rays, and then ordered an urgent CT scan.  (Doc. 130 59; Doc. 130-1 at 43–44.)  Based on the results of the imaging, NP Herrick submitted an urgent consult request for an ENT specialist, and she informed Beitman she would also send him to a dentist.  (*Id.* at 47: Doc. 195 ¶ 44.)  These initial actions taken by NP Herrick were reasonable responses to Beitman's injury and pain.

But thereafter, Beitman never saw an ENT or a dentist.  (Doc. 195 ¶ 45.)  Instead, NP Herrick had Beitman transferred out of the infirmary and into detention, and there is no evidence that she took any further action in response to Beitman's injuries and pain.  (Doc. 195 ¶¶ 42, 45–46.)  Beitman alleges that for the next five weeks, prior to his transfer out of the unit, he suffered extreme pain, difficulty breathing and eating, and loss of sleep.  (Doc. 35 at 7; Doc. 195 ¶ 45.)  Beitman avers, and CCS Defendants do not dispute, that he submitted multiple HNRs and emergency grievances.  (Doc. 35 at 7; Doc. 195 ¶ 46; Doc.

130-1 at 37; *see* Doc. 171 at 4–5.)  As mentioned, the Court must infer that NP Herrick was aware of Beitman's HNRs requesting treatment.  *See Jett*, 439 F.3d at 1094, 1097.  The record includes one HNR to which NP Herrick responded, stating that his consult request was still in the process of approval.  (Doc. 130-1 at 37.)[11]

NP Herrick avers that because Beitman's facial fractures were non-displaced, no further treatment was needed apart from pain medication.  (Doc. 130-1 at 34, Herrick Decl. ¶¶ 20, 24.)  But this claim that no further treatment was needed conflicts with her "urgent" request for an ENT appointment.   With their Reply, CCS Defendants submitted NP Herrick's trial testimony in a prior case related to injuries on the left side of the face that Beitman suffered in a 2015 assault.  (Doc. 171-1.)  NP Herrick testified that in February 2016, after the injury to Beitman's right side, she referred Beitman to an ENT "for evaluation" and "to determine treatment plan needed." (Doc. 171-1 at 24, Trial Tr. 313:3–7.)  She also testified that a patient could experience symptoms of trauma even without a fracture.  (*Id.* 327:22–24.)  The inference from this evidence is that, given Beitman's non-displaced fractures and continued pain, and the referral to a specialist to determine a treatment plan, some treatment was needed.  Yet, there is no evidence or medical records showing that Herrick ever re-examined Beitman or even prescribed pain medication during those five weeks, despite his severe pain and requests for treatment.  (*See* Doc. 130-1.)

On this record, there is a genuine issue of material fact as to whether NP Herrick was aware of Beitman's serious medical need and failed to take any action in response to his continued severe pain during the last five weeks that he was housed at the Kingman facility, thereby exhibiting deliberate indifference.

The final question in the Eighth Amendment analysis is whether Beitman suffered harm as a result of NP Herrick's deliberate indifference.  *See Jett*, 439 F.3d at 1096; *Hunt*, 865 F.2d 198.  To support that Beitman did not suffer harm, NP Herrick points to an April

---

[11] The February 24, 2016 HNR response also stated that Beitman's grievance was responded to "regarding his concerns." (Doc. 130-1 at 37.)  CCS Defendants did not submit Beitman's grievance documents.  (*See* Doc. 130-1.)

2019 ophthalmologist medical record, which found that Beitman had slight bulging in the right eye, but that it could not be determined whether this resulted from his previous injury, and that surgery was not recommended due to the risk of affecting his eyesight, which was 20/20 in each eye.  (Doc. 129 at 10; Doc. 131-1 at 49.)

Harm for the purposes of the Eighth Amendment is not limited to long-term vision problems or bulging.  As stated, Beitman avers that during the five weeks after NP Herrick initially treated him, he suffered severe pain that interfered with his breathing, eating, and sleeping.  *See S. Cal. Housing Rights Ctr. v. Los Feliz Towers Homeowners Ass'n*, 426 F. Supp. 2d 1061, 1070 (C.D. Cal. 2005) (a declarant has personal knowledge of his or her own symptoms).  Beitman's non-displaced fractures and pain could be found to constitute harm sufficient to support an Eighth Amendment claim.  *See Estelle*, 429 U.S. at 103 (Eighth Amendment applies even to "less serious cases, [where] denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose"); *McGuckin*, 974 F.2d at 1060 (pain and anguish suffered by prisoner constituted harm sufficient to support a § 1983 action).  The fact that NP Herrick was responsible for Beitman's lack of treatment for only five weeks before he was transferred does not preclude a finding of harm sufficient to support deliberate indifference.  *See Rasmussen v. Skagit Cnty.*, 448 F. Supp. 2d 1203, 1207–08, 1211–12 (W.D. Wash. 2006) (the fact that the defendant doctor "could not have stretched his allegedly deliberately indifferent provision of medical care over many months should not now preclude Plaintiffs' § 1983 claim").

In light of the above, summary judgment will be denied as to the claim against NP Herrick.

### 3.    CCS

To support a § 1983 claim against a private entity performing a traditional public function, such as providing medical care to prisoners, a plaintiff must allege facts to support that his constitutional rights were violated as a result of a policy, decision, or custom promulgated or endorsed by the private entity.  *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138–39 (9th Cir. 2012) (extending the "official policy" requirement for municipal

liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978), to private entities acting under color of law). Under *Monell*, a plaintiff must show: (1) he suffered a constitutional injury; (2) the entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional injury. *See Monell*, 436 U.S. at 691–94; *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001).

### a.    Constitutional Injury

The Court has already addressed the first *Monell* prong and found a question of fact as to whether Beitman suffered a constitutional injury as a result of NP Herrick's alleged deliberate indifference.

### b.    Policy or Custom

A policy is "a deliberate choice to follow a course of action" made by the officials or entity "responsible for establishing final policy with respect to the subject matter in question." *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992). A policy can be one of action or inaction. *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006). A "custom" for purposes of municipal liability is a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). While one or two incidents are insufficient to establish a custom or practice, the Ninth Circuit has not established what number of similar incidents would be sufficient to constitute a custom or policy. *See Oyenik v. Corizon Health Inc.*, No. 15-16850, 2017 WL 2628901, at *2 (9th Cir. June 19, 2017) (a reasonable jury could conclude that at least a dozen instances of defendant Corizon denying or delaying consultations and radiation treatment for cancer patient over a year amounts to a custom or

practice of deliberate indifference) (citing *Oviatt*, 954 F.2d at 1478).  But "[t]here is no case law indicating that a custom cannot be inferred from a pattern of behavior toward a single individual."  *Id.*

Beitman asserts that CCS has a policy of preventing treatment due to cost concerns.  (Doc. 160 at 22.)  He contends that, just like when he suffered his first facial injury in 2015, in 2016, the healthcare providers ignored requests to go to the hospital emergency room and intentionally destroyed x-ray images.  (Doc. 160 at 22.)  CCS argues that there is no evidence to support the existence of any policies to deny care or specialist treatment.  (Doc. 129 at 11–12.)

The constitutional injury recognized with respect to the *Monell* claim is the alleged deliberate indifference by NP Herrick after the initial treatment for his facial injuries in February 2016; specifically, the failure to respond to and address his severe pain in the five weeks following confirmation that he suffered nondisplaced facial fractures.  Thus, whether other medical staff initially refused to send Beitman to the emergency room or failed to save x-ray images is not relevant.

The evidence shows that there was an urgent consult request submitted for an ENT specialist appointment, and there is no explanation for why this consult was not approved or why the appointment never occurred.  But the failure to follow through on one consult request does not amount to a policy.  *Cf. Oyenik*, 2017 WL 2628901, at *2.

A policy is more likely where multiple employees are involved in the constitutional violation.  *See Henry v. Cnty. of Shasta*, 132 F.3d 512, 521 (9th Cir. 1997).  Here, the record supports that NP Herrick acted on her own in deciding that Beitman would receive no further treatment.

Finally, Beitman's arguments that he was denied treatment pursuant to a policy are based on conjecture and speculation that, because it happened to him, there must be a policy.  Such arguments are insufficient to defeat summary judgment.  *See R.W. Beck & Assoc. v. City and Borough of Sitka*, 27 F.3d 1475, 1480 n.4 (9th Cir. 1994) ("[a]rguments

based on conjecture or speculation are insufficient to raise a genuine issue of material fact").

For the above reasons, there is no genuine issue of material fact as to whether CCS had a deliberately indifferent policy that led to a constitutional violation.  The Court need not address the remaining *Monell* elements, and summary judgment will be granted in favor of CCS.

### C.    NP Igwe

NP Igwe began treating Beitman in September 2017, at which time Beitman was not receiving any testosterone treatment.  (Doc. 142 at 13, 34; *see* Doc. 196 ¶¶ 9, 10, 12.) Around this time, Beitman was seen for a breast lump and body aches, both of which he attributed to low testosterone.  (Doc. 196 ¶ 9; Doc. 142 at 38.)   Beitman repeatedly informed NP Igwe of his need for testosterone treatment, and he filed a medical grievance on the issue.  (Doc. 196 ¶¶ 10, 12, 14.)  Although NP Igwe ordered labs, she did not order the correct labs for free testosterone until January 2018.  (Doc. 142 at 44–45, 48.)  Upon receipt of the January 2018 test results showing "Below Low Normal" free testosterone, NP Igwe prescribed testosterone injections.  (Doc. 142 at 52.)

NP Igwe's initial failure to order the proper testing to assess Beitman's need for testosterone led to an approximate four-month delay in obtaining appropriate treatment. But the record shows that during those four months, Beitman's symptoms—a breast lump and body aches—were not significantly serious, and there is no evidence that the breast lump worsened or caused pain.  NP Igwe did not attribute his symptoms of muscle aches to low testosterone, and she instead adjusted his thyroid medication.  (Doc. 142 at 13, 38; Doc. 196 at 32; Doc. 142-1 at 54, Igwe Decl. ¶ 22.)  Thus, there is no evidence that the delay in ordering the proper tests was anything other than incompetence or negligence, which do not support an Eighth Amendment claim.  *See Estelle*, 429 U.S. at 106; *Montague*, 2018 WL 11241971, at *3.  The record shows that when NP Igwe ordered the proper free testosterone testing and received the results, she immediately prescribed testosterone injections, thereby responding reasonably as soon as she was aware of

Beitman's serious medical need.

NP Igwe treated Beitman until October/November 2018.  (*Id.* at 103.)  During the time she treated Beitman, NP Igwe continuously adjusted Beitman's testosterone doses based in part on his requests, his reports of symptoms, and in accordance with lab tests monitoring Beitman's free testosterone levels.  Beitman often disagreed with the dosing levels and schedule that NP Igwe ordered; however, as stated, a difference of opinion with a medical provider fails to support a constitutional violation.  *See Sanchez*, 891 F.2d at 242.  Notably, throughout the period in 2018 that NP Igwe was treating Beitman with testosterone injections, regular monitoring showed that his free testosterone levels were within normal limits or above normal.  (Doc. 142 at 63, 85, 90, 114.)

In short, there exists no genuine issue of material fact as to whether NP Igwe was deliberately indifferent to Beitman's serious medical need.  Summary judgment will be granted in favor of NP Igwe.

### D.    NP Hahn

NP Hahn first saw Beitman on November 29, 2018.  (Doc. 142 at 131; Doc. 196 52.)  At this time, Beitman was receiving testosterone injections 100 mg every two weeks.  (Doc. 142 at 103, 105, 132.)  Labs tests on December 9, 2018, and January 8, 2019 showed that Beitman's free testosterone was within normal limits.  (*Id.* at 136; Doc. 142-1 at 7.)

But in February 2019, lab results showed that Beitman's free testosterone level was "Below Low Normal."  (Doc. 49 at 20.)  When Beitman saw NP Hahn on March 1, 2019, she did not inform him of the February lab results, and she discounted his complaints about muscle cramps.  (Doc. 196 ¶ 60.)  Although NP Hahn ordered more labs on March 1, 2019, there is no evidence that she ordered another free testosterone test.  (Doc. 142-1 at 26.)  In fact, although her original plan in November 2018 was to conduct monthly labs to monitor Beitman's free testosterone levels, after the February 2019 lab tests, it appears that further lab tests were done just every few months, despite repeated low free testosterone readings.  (Doc. 142 at 133.)  Even on July 26, 2019, after receiving the lab results showing that Beitman's free testosterone levels were "Below Lower Panic Levels," NP Hahn ordered

1    that a lab panel be done again in 180 days.  (Doc. 60-1 at 71.)

2    When NP Hahn saw Beitman on April 11, 2019, she noted in the record and told

3    Beitman that "his labs have been good, including his Testosterone levels," despite the most

4    recent test available—February 2019—showing low free testosterone levels.  (*Id.* at 41, 43;

5    Doc. 142-1 at 41.)  Lab tests showed that Beitman's free testosterone was "Below Lower

6    Panic Levels" in July 2019, and it was still below normal in November 2019.  (Doc. 49 at

7    17, 19.)

8    The medical records also document that from March 2019 to November 2019,

9    Beitman's weight dropped from 161 pounds to 142 pounds.  (Doc. 142-1 at 21; Doc. 60-1

10    at 7–8, 67–68, 59–60.)

11    The evidence shows that in response to Beitman's consistently low free testosterone

12    levels—even "Below Lower Panic Levels"—and his continued weight loss, NP Hahn made

13    no changes to his testosterone medication or his course of treatment, she did not order more

14    frequent testing, and she falsely told Beitman that his free testosterone labs were good and

15    otherwise did not inform him of the low testosterone lab results.

16    Defendants argue that NP Hahn's failure to take any action was based on her

17    determination that Beitman's non-compliance with his thyroid medication may have

18    caused the low testosterone, and it was unsafe to increase his testosterone.  (Doc. 137.)  As

19    Beitman points out, however, his free testosterone levels measured below normal both

20    before and after he stopped taking his thyroid medication.  (Doc. 161 at 19; Doc. 49 at 20.)

21    Defendants assert that NP Hahn was "consistently responsive" to Beitman's medical

22    needs regarding testosterone, and she made a plan to make the thyroid medication "directly

23    observed therapy" so that Beitman's thyroid levels would be stabilized, at which point

24    Hahn could "reassess [his] hormone levels and testosterone dosage once thyroid levels

25    were clinically stable."  (Doc. 137 at 5, 13–14; Doc. 141 at 6–7.)  In addition, she ordered

26    an MRI in response to Beitman's reports of pituitary trauma, which she apparently

27    interpreted as a pituitary tumor.  (Doc. 60-1 at 7, 11–12.)  But this plan was not made until

28    NP Hahn's last encounter with Beitman on November 26, 2019—more than nine months

1   after Beitman's first low testosterone lab result, and four months after lab tests showed

2   "Below Lower Panic Levels" of free testosterone.  (*See* Doc. 142 ¶ 43; Doc. 49 at 19–20.)

3   More importantly, this plan was made only after Beitman grieved his medical issue and the

4   Medical Program Manager and the Centurion Medical Director got involved.  (Doc. 77 at

5   65.)  And the plan came after attorneys from the Prison Law Office wrote a letter on

6   Beitman's behalf about that lack of treatment for his low testosterone.  (Doc. 196 at 56.)

7        Finally, although NP Hahn claimed that she wanted to wait until Beitman's thyroid

8   levels were "clinically stable" before altering his treatment, there is no admissible evidence

9   to support that Beitman's thyroid levels were abnormal or unstable during the period in

10   2019 when NP Hahn was treating Beitman.[12]  The medical evidence shows that Beitman's

11   TSH levels, as well as his parathyroid hormone levels and sex hormone binding globulin

12   levels, all remained normal.  (Doc. 142-1 at 10, 26; Doc. 60-1 at 7; Doc. 49 at 18, 20.)

13        On this record, a reasonable jury could find that NP Hahn was aware of Beitman's

14   serious medical need, she misrepresented and withheld lab results from Beitman, and—

15   until superiors stepped in—she failed to take any action or alter treatment in response to

16   his consistently low testosterone levels and weight loss, thereby exhibiting deliberate

17   indifference.

18        As stated, Beitman must show that he suffered harm as a result of NP Hahn's

19   deliberate indifference.  *See Jett*, 439 F.3d at 1096.  Defendants assert that in March and

20   April of 2019, Beitman filed eleven HNRs for medical concerns, but none of these HNRs

21   related to pain or other concerns about low testosterone levels.   (Doc. 142 ¶ 38.)

22   Defendants further argue that Beitman did not have significant weight loss, that his medical

23   records do not document any complaints of testosterone-related pain from February to July

24

25        [12] In her declaration, NP avers that a July 23, 2019 lab result showed abnormal
26   thyroid levels.  (Doc. 142-1 at 48, Hahn Decl. ¶ 12.)  NP Hahn's declaration fails to cite to
     a July 23, 2019 lab result, and the Court cannot find any such record.  Accordingly, the
27   statement is unsupported and cannot be considered at summary judgment.  *See* Fed. R. Civ.
     P. 56(c)(1)(A); Fed. R. Civ. P. 56, advisory comm. note to 2010 amendments ("[m]aterials
28   that are not yet in the record—including materials referred to in an affidavit or
     declaration—must be placed in the record").

1   2019, and that Beitman failed to present medical evidence or expert testimony to establish

2   that he suffered any injury as a result of the delay in increasing his testosterone dosage.

3   (Doc. 137 at 15.)

4       Beitman does not dispute that in his March and April 2019 HNRs, he did not raise

5   complaints about low testosterone levels.  (Doc. 161 at 8.)  But in a couple of these HNRs

6   Beitman complained about exhaustion.  (Doc. 142-1 at 29–30.)  In August and September

7   2019, Beitman filed an Informal Complaint and Inmate Grievance about inadequate

8   testosterone medication, and he wrote that "for months" he had been complaining of

9   muscle cramps; pinched nerves in his back; pain in his hips, legs, and shoulders; and

10  continued testicle atrophy.  (Doc. 196 at 59, 61–62.)  Beitman filed another HNR in

11  November 2019, complaining of fatigue and joint pain and expressing his belief that these

12  symptoms were from low testosterone levels.  (Doc. 60-1 at 17.)  And on November 12,

13  2019, Beitman initiated the grievance process again and complained about weight loss and

14  muscle cramping and tearing.  (Doc. 49 at 7.)  In addition, Beitman states that he made

15  complaints about his back pain to NP Hahn, but she refused to document his complaints in

16  the medical records, and he expressed his concerns about his weight loss, but NP Hahn

17  simply told him to eat more.  (Doc. 162 at 11.)  Beitman states that he tried to eat as much

18  as he could to stop the weight loss and deterioration.  (*Id.* at 12.)

19      Beitman argues that, contrary to Defendants' contention, his weight loss was

20  significant.  (*Id.*)  He explains that for 30 years prior to his incarceration, his normal body

21  weight was 180 pounds.  (*Id.*)  The medical records confirm that in the first couple years

22  of his incarceration, Beitman's weight was around 180 pounds.  (Doc. 142 at 13, 55.)

23  Beitman states that his weight was muscle mass, not fat; thus, the loss of 19 pounds from

24  March to November 2019, down to 142 pounds, caused muscle deterioration, pulled

25  muscles, and damaged tendons, all of which caused "a physically painful nightmare" and

26  affected his daily activities.  (Doc. 162 at 12.)

27      As mentioned, harm for purposes of the Eighth Amendment includes "less serious

28  cases" involving pain, suffering, and anguish.  *See Estelle*, 429 U.S. at 103; *McGuckin*, 974

F.2d at 1060.  The Ninth Circuit has recognized that pain and weight loss can constitute harm sufficient to support an Eighth Amendment claim.  *See Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000) (finding sufficient evidence to support that the plaintiff was harmed by prison officials' failure to provide a prescribed liquid diet where the plaintiff lost 22 pounds and his healing was slowed by the lack of proper nutrition); *Hunt v. Dental Dept.*, 865 F.2d 198, 201 (9th Cir. 1989) (finding that where the plaintiff suffered pain and weight loss due to his inability to eat properly during a three-month delay, "it reasonably could be concluded that the delay was deliberate and it caused [the plaintiff] to suffer unnecessary and wanton infliction of pain"); *see also Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003) (the plaintiff's pain, bleeding gums, and periodic weight loss constituted sufficient harm to support deliberate indifference claim).

Medical evidence that Beitman lost approximately 20 pounds while NP Hahn was his provider, and his allegations that he suffered fatigue, muscle deterioration, and back and muscle pain during that period are sufficient to support that he suffered harm as a result of NP Hahn's alleged deliberate indifference.  Summary judgment will therefore be denied as to the claim against NP Hahn.

**E.  Centurion**

As set forth above, to support a § 1983 claim against Centurion, Beitman must show that: (1) he suffered a constitutional injury; (2) the entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional injury.  *See Monell*, 436 U.S. at 691–94; *Mabe*, 237 F.3d at 1110–11.

The Court has already determined that there is a question of fact as to whether Beitman suffered a constitutional injury as a result of NP Hahn's alleged deliberate indifference.

Beitman alleges that Centurion practitioners act pursuant to a policy or practice to deny care in order to increase profits.  (Doc. 162 at 21.)  Beitman does not provide evidence of such a policy, and the record does not support that Centurion practitioners routinely deny

1    treatment or act with deliberate indifference.

2           The evidence shows that once NP Hahn was no longer Beitman's provider, he began

3    receiving regular testing and monitoring of his free testosterone levels and weekly

4    testosterone injections.  (Doc. 138-1 at 15, 21, 24–25, 27, 44; Doc. 138-2 at 6–7, 15, 21.)

5    Beitman was also provided prescriptions for Nature-Throid tablets and DHEA

6    supplements.  (Doc. 138-1 at 40; Doc. 77 at 9, 44.)  Beitman even acknowledged that some

7    of his providers—NP Powell, NP Kary, and NP Weigel—really care and try to do as much

8    as they can.  (Doc. 162 at 21.)  In short, there is no evidence to support that NP Hahn was

9    acting pursuant to a policy to withhold treatment for financial reasons.

10          We respect to his current treatment, Beitman states that he is still not receiving

11   Humatropin or Sermorelin, and that the DHEA supplement needs to be adjusted.  (Doc.

12   162 at 22.)  Beitman states that he is "being patient" in his attempts to get all the treatment

13   he had received from Dr. Stallone, and he is allowing Centurion the opportunity to treat his

14   condition before he again seeks injunctive relief.  (*Id.* at 22–23.)  Beitman also asserts that

15   he still suffers back pain and requires disc replacement, but he acknowledges that he has

16   not complained to medical about his back because he cannot take pain medication.  (Doc.

17   162 at 20.)  He posits that Centurion would not pay for necessary treatments or otherwise

18   follow up on his deteriorated disc injuries anyway.  (*Id.*)  Finally, although in his amended

19   pleading Beitman requested injunctive relief in the form of medical treatment to repair

20   injuries to his face, at summary judgment, he did not present any allegations that he has

21   requested treatment to repair facial injuries.  (*See* Doc. 35 at 9; Docs. 161–162.)

22          There can be no finding of deliberate indifference on the part of Centurion staff if

23   Beitman did not make them aware of his injuries or pain.  *See Farmer*, 511 U.S. at 837 (to

24   be liable for deliberate indifference, an official must "be aware of facts from which the

25   inference could be drawn that a substantial risk of serious harm exists").  Accordingly,

26   there is no genuine issue of material fact as to whether Beitman is currently subjected to

27   deliberately indifferent medical care.

28          For the above reasons, summary judgment will be granted in favor of Centurion.

1   **VI.     Punitive Damages**

2          Defendants seek summary judgment as to Beitman's claim for punitive damages on

3   the ground that Beitman cannot show NP Hahn engaged in any conduct based on an evil

4   motive or reckless disregard for Beitman's constitutional rights.  (Doc. 137 at 17.)

5          A request for punitive damages is not a separate claim, but rather a request for a

6   particular relief as to Beitman's constitutional claims.  Further, whether punitive damages

7   are warranted is an issue reserved for the jury.  *See Pacific Mut. Life Ins. Co. v. Haslip*, 111

8   U.S. 1, 16 (1991) (noting that, with respect to punitive damages, "[t]his has been always

9   left to the discretion of the jury, as the degree of punishment to be thus inflicted must

10  depend on the peculiar circumstances of each case") (quotation omitted); *Smith v. Wade*,

11  461 U.S. 30, 48, 54, 56 (1983) ("punitive damages are awarded in the jury's discretion").

12  Here, a reasonable jury could conclude that NP Hahn exhibited conduct "shown to be

13  motivated by evil motive or intent, . . . or reckless or callous indifference to the federally

14  protected rights of" Beitman, thereby warranting punitive damages.  *Smith*, 461 U.S. at 56.

15  The request for summary judgment as to punitive damages will be denied.

16  **IT IS ORDERED:**

17          (1)     The reference to the Magistrate Judge is **withdrawn** as to CCS Defendants'

18  Motion for Summary Judgment (Doc. 129), Centurion and NP Hahn's Motion for

19  Summary Judgment (Doc. 137), and NP Hahn and NP Igwe's Motion for Summary

20  Judgment (Doc. 141).

21          (2)     CCS Defendants' Motion for Summary Judgment (Doc. 129) is **granted** as

22  to the claims against Dr. Gruenberg, Nurse Norton, Dr. Schmidt, and CCS and otherwise

23  **denied**.

24          (3)     Centurion and NP Hahn's Motion for Summary Judgment (Doc. 137) is

25  **granted** as to the claim against Centurion and otherwise **denied**.

26          (4)     NP Hahn and NP Igwe's Motion for Summary Judgment (Doc. 141) is

27  **granted** as to the claim against NP Igwe and otherwise **denied**.

28          (5)     Dr. Gruenberg, Nurse Norton, Dr. Schmidt, NP Igwe, CCS, and Centurion

are **dismissed** as Defendants.

(6)     The remaining claims are the Eighth Amendment medical care claims against NP Herrick and NP Hahn in their individual capacities.

(7)     This action is referred to Magistrate Judge Michelle H. Burns to conduct a settlement conference on the remaining claims.

(8)     Defense counsel for NP Herrick and NP Hahn must arrange for the relevant parties to jointly call Magistrate Judge Michelle H. Burns' chambers at (602) 322-7610 within 14 days to schedule a date for the settlement conference.

Dated this 15th day of September, 2021.

James A. Teilborg
Senior United States District Judge